# United States Court of Appeals
## For the First Circuit

No. 11-2083

UNITED STATES,

Appellee,

v.

FERMIN GUEVARA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro,  U.S. District Judge]

Before

Thompson, Selya and Lipez,

Circuit Judges.

Elizabeth Doherty for appellant.
Mark T. Quinlivan, Assistant U.S. Attorney, with whom Carmen
M. Ortiz, United States Attorney, was on brief, for appellee.

January 28, 2013

**LIPEZ, <u>Circuit Judge</u>**.    Appellant Fermin Guevara was convicted on drug charges that arose from a reverse sting operation set up by law enforcement authorities in Massachusetts after Guevara talked with an informant in Peru about purchasing cocaine there for sale in Boston.    On appeal, Guevara argues that the district court's conspiracy instruction was inadequate and that the court erred in failing to instruct the jury on the defenses of withdrawal and entrapment.    We find no flaw in the conspiracy instruction and no error in the failure to instruct on either affirmative defense.    Hence, we affirm.

## I.

The facts, as supported by the record, are as follows. Appellant Guevara regularly traveled from Boston to Peru to visit family and friends.    While in Peru in November 2008, he was introduced to Patricia Lecaros-Velasquez, an interior designer who had worked as a paid informant for both the Drug Enforcement Administration ("DEA") and the equivalent Peruvian drug agency. Lecaros-Velasquez testified that the mutual friend who introduced them did not know that she was a drug informant, and the meeting was not set up to discuss drug dealing.    The friend, however, had told Lecaros-Velasquez that he had once lived with Guevara in Boston and that drugs had been sold from the house where they lived.

In their first meeting, at the Haiti Restaurant in Miraflores, Guevara told Lecaros-Velasquez that he had traveled to Peru to find a supplier for "chickens" and "animals," which Lecaros-Velasquez understood as coded references to drugs. She offered to introduce Guevara to a supplier, and Guevara then made a phone call to his boss, whom he called "Peluche." Lecaros-Velasquez also spoke briefly with Peluche, later identified as Victor Jaramillo-Arezia ("Victor"), who asked when she could "come up" to the United States so they could discuss "interesting things." At the end of the meeting, Guevara gave Lecaros-Velasquez his phone number and later gave her Victor's as well.

Guevara and Lecaros-Velasquez met again at the Haiti Restaurant on January 31, 2009. By that time, Lecaros-Velasquez had contacted Peruvian authorities, who conducted surveillance and videotaped the meeting while she secretly made an audio recording. The pair were joined by a third individual, introduced to Guevara as Lecaros-Velasquez's associate "Pedro," whom she said was closer to the source of the cocaine. In fact, Pedro was another paid government informant. Lecaros-Velasquez told Guevara that she had spoken with Victor by phone, and Guevara responded, "Yes, he's my partner."

The trio then discussed setting up a drug dealing operation in which Guevara and Victor would regularly buy cocaine in Peru for sale in Boston. Although the word "cocaine" was never

used in the conversation, there is no dispute that it was the subject of their lengthy exchange. Guevara initially told Lecaros-Velasquez that, "over there we, in our area we move fifty (50) or more animals," which Lecaros-Velasquez understood as an assertion that he and Victor could sell fifty kilograms of cocaine in the Boston area. Later in the conversation, Guevara said that they could handle fifty "animals" weekly, but they would need delivery to New York or Boston.[1] He warned that "we'll be checking each animal, one at a time," because "[a]ny work we don't like, we throw back." The check was best done upon delivery, he explained, "because sometimes along the way you don't move it, someone else moves it and it has happened in Medellin, that has happened." The implication was that checking upon delivery was necessary because the product shipped was not always the product delivered.[2]

Before getting the enterprise fully underway, Guevara proposed a small transaction "[w]ith one (1) animal, two (2), three (3), whatever there is," to "break the ice" and "[t]o gain trust" in the relationship. He assured the others that he would stay in

---

[1] Pedro asked if Guevara was "capable of receiving fifty (50) a week from us," to which he responded: "Yes. We are capable."

[2] Guevara elaborated on the concern as follows:

Unfortunately, we don't trust on that side. Because sometimes you don't move it, the [unintelligible] move it, a lot of people move it, you know? So when they move it, it arrives moved. So it's better to check everything there. Not to check it here. That's the problem.

Peru "[u]ntil the deal is closed," but urged them to act quickly so it could happen before his planned departure in a few days.  In a call to Victor, Guevara secured the okay for "size 24," referring to the $24,000-per-kilogram price that Pedro had just offered:

> PEDRO: In Boston, right?  I can guarantee the quality . . . at twenty-four (24).
> GUEVARA: Twenty-four (24).
> PEDRO: I guarantee you the quality and the purity . . . .
>
> . . . .
>
> [*PHONE CONVERSATION*: *Hello, Papo?  Uh, listen, buddy, the pants are small, man, size 22, uh, so the, seamstress wants 24, size 24.  Is size 24 alright? Do you agree?  Is it alright? Hello, hello . . .]*  My service went down.  Okay, but, he did tell me yes, that there is no problem.
> PEDRO: Yeah.
> GUEVARA:  Let's do it.  Let's do it with twenty-four (24).  Let's do it with twenty-four (24).  Put down there what you can, what you have [unintelligible] one (1) . . . Put it down.  There is no problem.  Put it down, brother.

A third meeting was scheduled for February 3, also at the Haiti Restaurant, but Guevara failed to appear.  When Lecaros-Velasquez eventually reached him by phone after repeatedly calling, Guevara said he was not coming because he was drinking.  Lecaros-Velasquez called Victor, who said he also had not spoken to Guevara "because I called him and he isn't answering."  Victor confirmed the $24,000 price. Lecaros-Velasquez had no subsequent interactions with Guevara about the drug operation, thereafter dealing only with Victor.

Sometime in February, Boston DEA agents were alerted to the planned cocaine importation enterprise by a DEA office in Peru, and they set up a reverse sting operation.[3] A DEA Task Force officer posing as an associate of Lecaros-Velasquez, and using the name "Mario," contacted Victor to make arrangements to supply the Peruvian cocaine. On February 13, the officer, Detective Luis Rodriguez of the Chelsea (Massachusetts) Police Department, met with Victor and another individual in the parking lot of the South Bay Shopping Center in Dorchester. The men, sitting in Rodriguez's car, agreed to a transaction of ten kilograms at a price of $24,000 per kilo, and further agreed that they would be in touch again when the cocaine was ready for delivery. At the conclusion of the meeting, Victor and the third man, identified only as "Don Miguel," exited Rodriguez's vehicle and got into a cab registered to Guevara.

In a phone call on February 23, Rodriguez and Victor arranged to meet the following day in a Wendy's parking lot in East Boston. Rodriguez reported that he would be bringing the "ten keys for the apartments," code for the ten kilos of cocaine. The next day, Victor and Rodriguez met at the Wendy's lot, but then agreed to move the transaction to a Home Depot parking lot in Saugus,

_____

[3] Ordinary sting operations involve the attempted purchase of drugs by undercover agents. In a reverse sting, agents offer to sell drugs to their targets. United States v. Meises, 645 F.3d 5, 8 n.2 (1st Cir. 2011).

-6-

Massachusetts, where there were no security cameras. Guevara dropped Victor off at Wendy's, but did not participate in the conversation.

Later the same day, with a law enforcement surveillance team videotaping the encounter, Victor arrived at the Home Depot accompanied by Alexander Lopera and Guevara, the latter having driven the men in his taxi. Victor entered Rodriguez's vehicle carrying a red backpack, but the men left the car and entered the store after Victor expressed concern about transferring the backpack full of cash in the vehicle. A few minutes later, Victor handed Rodriguez the backpack as they walked up an aisle in the store. Guevara and Lopera approached as Rodriguez, who was carrying a concealed audio recorder, stood at the end of the aisle inspecting the backpack's contents -- a plastic bag containing bundles of cash wrapped in rubber bands. Victor introduced Lopera as his brother and Guevara as his friend. Rodriguez testified that the four men then discussed the details of the cocaine transfer, agreeing that Rodriguez would stay with Victor while Lopera got into the vehicle that would be bringing the drugs so he could check on the quantity and quality of the cocaine. Rodriguez acknowledged, however, that the conversation that took place in Guevara's presence did not specifically refer to either a money exchange or drug quantity and quality, but focused solely on who would be leaving the parking lot with whom and in which car.

The four men exited the Home Depot together and walked toward an undercover vehicle driven by Task Force Officer Jaime Cepero, whom Rodriguez had summoned while the men were in the store.[4] Ten wrapped blocks shaped to resemble kilograms of cocaine had been placed in a hidden compartment in the back of the vehicle. From the driver's side, Rodriguez, Victor, and Guevara looked into the backseat, where the hidden compartment had been opened, and Guevara then immediately started walking back to his taxi. Rodriguez and Victor headed toward Rodriguez's vehicle, while

---

[4] Shortly after Rodriguez proposed that he and Victor drive around in Rodriguez's car while the cocaine was being checked out, the conversation continued, in pertinent part, as follows:

LOPERA: So do we leave?
GUEVARA: No, wait, because he is going to leave in the car.
LOPERA: That's why, I'll leave with him.
GUEVARA: Yes, they are going to go.

. . . .

RODRIGUEZ: Are the two of you going to get in or just one? The two of you?
GUEVARA: No. One.
RODRIGUEZ: Oh, just one.
LOPERA: I'm going to [unintelligible] with him.

. . . .

CEPERO: Does he go with me?
RODRIGUEZ: He goes with you, yes.
GUEVARA: Yes, he'll go with.

. . . .

CEPERO: Shall we go?
LOPERA: Let's go.
RODRIGUEZ: We are going to wait for you guys out here.

-8-

Lopera remained standing on the passenger side of Cepera's vehicle. Moments later, Guevara, Victor, and Lopera were arrested. The Task Force officers seized $80,020 from the red backpack.

All three men were charged in federal court in Massachusetts on two counts: conspiracy to both possess with intent to distribute and to distribute cocaine (Count One), see 21 U.S.C. § 846, and attempted possession with intent to distribute cocaine (Count Two), see id. §§ 841(a)(1), 846. Guevara and Lopera were tried jointly, and the jury convicted them on both counts. Victor pleaded guilty to both counts. This appeal is brought only by Guevara, who was sentenced to fifty months' imprisonment and three years of supervised release.[5]

Guevara asserts three prejudicial instructional errors. We consider each in turn.

## II.

Appellant argues that the district court's conspiracy instruction gave the jury the incorrect impression that it could find him guilty on Count One even though the evidence failed to show a meeting of the minds between him and any alleged co-conspirator. Specifically, he complains that the court erred in refusing to instruct the jury that negotiations to engage in a criminal scheme do not establish the agreement required to prove a

---

[5] Lopera was sentenced to a term of sixty months' imprisonment and Victor received a sentence of fifty months' imprisonment. Both men were sentenced to five years of supervised release.

conspiracy.  He maintains that such an instruction was necessary because his defense was premised in part on the contention that his discussions with Lecaros-Velasquez never matured into an agreement to deal drugs.[6]

The district court's initial charge to the jury defined a conspiracy as "an agreement or mutual understanding knowingly made or knowingly entered into by at least two persons to violate the law through some joint or common plan or course of action." The court went on to explain that, to find the defendants guilty of conspiracy, the jury needed to conclude that the government had proven two facts beyond a reasonable doubt:

> First, that the agreement alleged existed between the defendants and at least one other person to possess with intent to distribute or to distribute a controlled substance.
>
> Second, that the defendant whose case you are considering willfully joined in that agreement.  A conspiracy is an agreement, spoken or unspoken.  A conspiracy does not have to be a formal agreement or plan in which everybody involved sat down together and worked out all the details but the government must prove beyond a reasonable doubt that

---

[6] In a pre-trial filing, Guevara proposed, in pertinent part, the following instruction:

The government also must prove beyond a reasonable doubt that an agreement (even if not a formal one) was in fact reached.  If the defendant negotiated with others to carry out an illegal [act], but the defendant did not reach or was not part of an agreement to carry out an illegal act, he can not be found guilty of conspiracy.

-10-

> those who were involved shared a general understanding about the crime.
>
> Mere similarity of conduct among various people or the fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy but you may consider such factors.

The court also stressed the need to identify evidence of each defendant's own participation:

> Proof that the defendant willfully joined in the agreement must be based upon evidence of his own words or actions. You need not find that the defendants agreed specifically to the crime or knew all the details of it or knew every other co-conspirator or that he participated in each act of the agreement or played a major role but the government must prove beyond a reasonable doubt that the defendant knew the essential features and general aims of the venture.

Following the charge, Guevara renewed his request for an "instruction that mere negotiations are not sufficient, that talk is not enough, there must be a meeting of the minds all in connection with the conspiracy." In rejecting the request, the court noted that it considered the point "covered . . . properly in my instructions." However, after the jurors asked during deliberations for additional guidance on the definition of conspiracy,[7] the court responded to the jurors' query as follows:

---

[7] The jurors asked: "Can you give us clarification on what is a conspiracy, how to define it? Specifically if people show up together, does that constitute conspiracy?"

A conspiracy simply stated is an agreement to disobey or disregard a particular law. An agreement to disobey or disregard a particular law. That is what a conspiracy is, an agreement to disobey or disregard a particular law.

You asked specifically if people show up together, does that constitute conspiracy? The answer to that question is no, not necessarily. People may talk together and they show up together but the question for you as far as conspiracy is whether there is an agreement to violate or disregard the law, not whether they just happened to be at a particular place at a particular time, okay.

Guevara points to the jury's request for assistance as evidence that the court's original conspiracy instruction did not adequately explain the difference between preliminary discussion and an actual meeting of the minds. He insists that the agreement to engage in an ongoing cocaine purchase-and-sale scheme was reached by Victor and the undercover agents after he was out of the picture, and he asserts that "a properly instructed jury might well have reached a different result."

It is well established that "a court 'need not give instructions in the precise form or language requested by the defendant.'" United States v. Sampson, 486 F.3d 13, 37 (1st Cir. 2007 (quoting United States v. Beltran, 761 F.2d 1, 11 (1st Cir. 1985)). Moreover, although a defendant ordinarily is entitled to an instruction reflecting his theory of the case, the refusal to adopt proposed language "is not ground for reversal where the court's instruction substantially covers the request." United

-12-

States v. Noone, 913 F.2d 20, 30 (1st Cir. 1990); see also United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009). We review for abuse of discretion a properly preserved objection to "'the form and wording'" of an instruction, Gonzalez, 570 F.3d at 21 (quoting United States v. McFarlane, 491 F.3d 53, 59 (1st Cir. 2007)), including whether the instruction "'adequately explained the law or . . . tended to confuse or mislead the jury on the controlling issues,'" United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010) (quoting United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009)).

Appellant's claim of error does not scale the necessary hurdles. Guevara wanted the jurors to be told that he could not be convicted of conspiracy if they found that he participated only in negotiations for a drug importation scheme and not in an agreement to move ahead with the operation. That is, in essence, what the court told them. Although the court's charge did not explicitly state that something more than negotiations was necessary to form a conspiracy, the court repeatedly instructed that guilt on the conspiracy count required "an agreement or mutual understanding" to violate the law. The court's original instruction succinctly defined a conspiracy as "an agreement, spoken or unspoken," and its follow-up instruction re-emphasized that a conspiracy requires "an agreement to violate or disregard the law."

We recognize that an instruction explicitly distinguishing negotiations from an agreement would have been

-13-

preferable from Guevara's perspective, and such an instruction would have been proper. A rational jury, however, would be unlikely to confuse the preliminary nature of "negotiations" with the meeting of the minds necessary for an "agreement." The court's instruction therefore adequately conveyed to the jury that Guevara could not be found guilty of conspiracy if his involvement in the drug dealing scheme was limited to the negotiations that preceded an "agreement."

Hence, we find no abuse of discretion in the district court's choice of language for the conspiracy instruction.

### III.

Asserting that he was entitled to a jury instruction on any valid defense theory supported by the record, Guevara argues that the district court erred in refusing to instruct the jury that withdrawal is a defense to a conspiracy charge and failing to instruct on entrapment sua sponte. Guevara correctly states the governing principle, see, e.g., United States v. Sherman, 551 F.3d 45, 52-53 (1st Cir. 2008) (noting criminal defendant's entitlement to instruction), but, as we shall explain, his withdrawal claim is flawed as a matter of law and his entrapment claim falters on the record before us.

### A. Withdrawal

Guevara proposed a jury instruction on withdrawal that included the following statement:

> If you find that defendant withdrew from the conspiracy, you must find him not guilty, even if the defendant was later in the presence of any other conspirator, so long as defendant did not rejoin the conspiracy.

On appeal, Guevara reiterates his contention that withdrawal was a viable defense to the conspiracy charge and asserts that he was entitled to an instruction on that theory. This claim is a nonstarter. "Far from contradicting an element of the offense, withdrawal presupposes that the defendant committed the offense." Smith v. United States, No. 11-8976, 2013 WL 85299, at *3 (U.S. Jan. 9, 2013). Thus, even upon withdrawal, a defendant "remains guilty of conspiracy." Id.; see also id. at *6 ("His individual change of heart . . . could not put the conspiracy genie back in the bottle.").[8]

A defendant charged with conspiracy may pursue a withdrawal theory, however, to "achieve[] [a] more modest end[]" than exoneration," i.e., to avoid responsibility for post-withdrawal activities of his co-conspirators. Id. at *3. Guevara offers no such rationale for a withdrawal instruction. Indeed, Guevara's only developed argument is that the instruction was essential to his "key defense theory" that he withdrew from the negotiations before an agreement for a drug deal had been reached.

---

[8] Withdrawal may provide a complete defense when it occurs outside the applicable statute-of-limitations period. See Smith, 2013 WL 85299, at *2. There is no statute-of-limitations issue in this case.

-15-

But that theory seeks a finding that Guevara was never a member of the conspiracy at all -- a circumstance inconsistent with the concept of "withdrawal."

Guevara has thus failed to offer a proper justification for a withdrawal instruction, defeating his claim of error.[9]

## B. Entrapment

Guevara neither requested an entrapment instruction nor objected contemporaneously to the omission of such an instruction from the court's charge, and he thus must demonstrate plain error in the district court's failure to instruct the jury on that defense. See United States v. Appolon, 695 F.3d 44, 59-60 (1st Cir. 2012). He is unable to show any error at all, however, let alone one that "seriously impaired the fairness, integrity, or public reputation" of his trial. Id. at 60 (listing this showing, among others, as necessary to establish plain error).

---

[9] The record was in any event inadequate to permit a finding of withdrawal. To prove withdrawal from a conspiracy, a defendant must show that he took affirmative steps "either to defeat or disavow the purposes of the conspiracy." See United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam). "Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." Id. As evidence of withdrawal, Guevara relies on his failure to appear for the February 3 meeting and his refusal to answer telephone calls from Lecaros-Velasquez and Victor. These behaviors, however, constitute inaction rather than affirmative steps to distance himself from his prior involvement. See, e.g., Smith, 2013 WL 85299, at *5 ("Passive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy.").

-16-

To be entitled to an entrapment instruction, a defendant has the burden to "'adduce "some hard evidence"'" both that the government induced him to commit the charged crime and that he lacked a predisposition to commit the offense. United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012) (quoting United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009) (quoting United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008))). Inducement entails not only giving the defendant the opportunity to commit the crime, but also the "'"plus"'" factor" of government overreaching. Id. at 10 (quoting Vasco, 564 F.3d at 18 (quoting United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994))). Qualifying government conduct includes excessive pressure, such as the use of intimidation, threats, or "dogged insistence," Vasco, 564 F.3d at 18, and "taking advantage of an alternative, non-criminal type of motive," Gendron, 18 F.3d at 961.

We view the evidence in the light most favorable to Guevara in determining whether the record supports an entrapment theory. See Vasco, 564 F.3d at 18. From that perspective, the jury could have plausibly concluded that Lecaros-Velasquez set up the first meeting with Guevara in the hope that she could lure him into a sham drug deal. She knew that drugs had been sold from a house in Boston where he had lived, indicating that he might be a susceptible target. Guevara, however, was the one who first raised the subject of drugs when he told Lecaros-Velasquez that he had

-17-

traveled to Peru in pursuit of a source for "chickens" and "animals." Despite this affirmative expression of interest in buying drugs, Guevara argues that Lecaros-Velasquez's immediate offer to connect him with a supplier and her subsequent conduct in arranging meetings and initiating phone contact improperly induced him into the scheme.

These actions by Lecaros-Velasquez, though facilitating Guevara's participation in the enterprise, do not reach the threshold of aggression required for inducement. Rather than the threats, "dogged insistence," or similar excessive pressure necessary to establish government overreaching, id., they amount to no more than "the simple solicitation of a criminal act" that we repeatedly have held inadequate to support a finding of wrongful inducement, United States v. Ramos-Paulino, 488 F.3d 459, 462 (1st Cir. 2007); see also Dávila-Nieves, 670 F.3d at 11 ("'[N]either mere solicitation nor the creation of opportunities to commit an offense comprises inducement as that term is used in entrapment jurisprudence.'" (quoting United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994))). Clearing the way for criminal activity is not the same as pushing the defendant down a pathway toward crime.

Because the record thus lacks evidence of the requisite "something more" for inducement, an entrapment instruction was not warranted. Ramos-Paulino, 488 F.3d at 462. Although Guevara's inability to support his claim of inducement makes it unnecessary

for us to consider the issue of predisposition, <u>id.</u> at 462 n.1; <u>see also</u> <u>Vasco</u>, 564 F.3d at 20, we note that the record evidence described above leaves no doubt that his claim also would stumble on that prong of the entrapment inquiry.  In sum, the district court did not commit reversible error in failing to instruct the jury on entrapment.

**IV.**

Having found no merit in any of appellant's claims of instructional error, we affirm the judgment of the district court.

<u>So ordered.</u>