# United States Court of Appeals
## For the First Circuit

No. 12-2395

UNITED STATES OF AMERICA,

Appellee,

v.

BETH A. STEWART,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Howard, Circuit Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

Lawrence Gatei, with whom Immigration & Business Law Group, LLP was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

February 26, 2014

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

STAHL, Circuit Judge. Following a bench trial on a record of stipulated facts, Defendant-Appellant Beth A. Stewart was convicted of conspiracy to defraud the United States for participating in a sham marriage to secure a change in immigration status for her spouse. She appeals, arguing that the prosecution was time-barred because she committed no overt act in furtherance of the conspiracy within the five-year period before the return of the indictment. We disagree, and affirm.

## I. Facts & Background

On September 22, 2011, a grand jury returned a one-count indictment charging Stewart with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The indictment was filed the following day. The indictment charged that Stewart was a United States citizen, and that her spouse (identified only by his initials, FN) was a citizen of Kenya who had entered the United States legally, but whose authorization to remain was set to expire. The indictment alleged that, "[f]rom on or about March 29, 2005, and continuing until a date unknown but at least June 22, 2007, . . . Stewart knowingly and willfully conspired and agreed, with others both known and unknown to the Grand Jury, to participate in a sham marriage for the purpose of defrauding the United States." According to the indictment, the conspiracy had two objects: (1) for Stewart to "profit financially by accepting payments from co-conspirators, including [FN], in exchange for

-2-

participating in a sham marriage and helping [FN] obtain a change of his immigration status"; and (2) for FN to "acquire a change of United States immigration status to which he would not otherwise have been entitled by falsely representing to agencies of the United States Government that the marriage into which [FN] had entered was bona fide when in fact it was not."

Finally, the indictment alleged that Stewart committed the following overt acts in furtherance of the conspiracy: (1) she entered into a sham marriage with FN on March 29, 2005, knowing that "the sole purpose of the wedding was to permit FN to apply for a change in immigration status to which he would not otherwise have been entitled"; (2) between the wedding date and October 27, 2005, she traveled to Massachusetts and obtained various documents to make it appear that she and FN were living together when in fact they were not, understanding that these documents would be filed in support of FN's petition to have his immigration status changed; (3) on October 7, 2005, she and FN attended an interview at the Boston offices of the U.S. Citizenship and Immigration Service ("USCIS") in support of that petition, with FN being granted conditional residency on that date based upon the information they had provided; and (4) on June 22, 2007, she traveled to Massachusetts and signed a Form I-751, Petition to Remove Conditions on Residence, on FN's behalf, which form was subsequently filed with USCIS.

Stewart filed a motion to dismiss the indictment as time-barred, arguing that the signing and filing of the Form I-751 -- the only overt act alleged within the five-year statute of limitations period, see 18 U.S.C. § 3282 -- was not done in furtherance of the conspiracy. She contended that the object of the conspiracy had been achieved on October 7, 2005, when USCIS granted FN lawful permanent resident ("LPR") status on a conditional basis.[1] Thus, she insisted, the Form I-751 was irrelevant to the conspiratorial objectives. The government argued that FN's receipt of conditional LPR status was simply the first step toward unconditional legal permanent residence and eventually citizenship, and the filing of the Form I-751 was a further step in that process. The district court denied Stewart's motion, holding that the indictment was facially sufficient to put her on notice of the elements of the crime and the nature of the charge, and that it was not for the court to inquire whether the evidence would ultimately be sufficient to support that charge.

The matter then proceeded to a bench trial on a record of stipulated facts and associated exhibits. We summarize those stipulations here. FN was a Kenyan national who entered the United States in 2001 on a visa that was set to expire in September of 2006. Through various third parties, Stewart learned that a

---

[1] Under 8 U.S.C. § 1186a(a) and (h)(1), an alien spouse who is granted LPR status within two years of the qualifying marriage is considered to have obtained that status on a conditional basis.

marriage arranger was looking for someone to marry a foreign national in return for $4,000. She agreed to participate in the sham marriage. On March 29, 2005, Stewart met FN for the first time at the City Hall in Auburn, Maine, where the two applied for and obtained a marriage license. They were married later that day, with Stewart and FN both signing the marriage license and listing as their residence an address where neither had ever lived. Stewart understood that the purpose of the marriage was to allow FN to stay in the United States and that she would be paid for her participation. After the ceremony, Stewart was paid $1,000. In June, FN gave Stewart a money order for $1,500, which she used to secure an apartment in Lewiston, Maine. FN never resided in that apartment, and in fact lived in Massachusetts. Stewart occasionally traveled to Massachusetts after the marriage: once, she went to what she understood to be FN's apartment, where the two posed for photographs; another time, she obtained a Massachusetts identification card, listing as her residence a Lowell, Massachusetts, address where she had never lived; yet another time, she and FN opened a joint bank account. In May, FN (or someone acting on his behalf) signed Stewart's name to several USCIS forms, seeking to have FN's immigration status changed on the basis of the marriage. FN also signed a Form I-485 seeking the same relief. In August, FN gave Stewart an additional $1,500. Stewart gave FN copies of her I.R.S. W-2 forms for 2002–2004, which FN or someone

acting on his behalf used to generate what purported to be Stewart's tax returns for those years. The marriage certificate, photographs, Massachusetts identification card, and tax returns, as well as copies of checks drawn on their joint account, were all submitted to USCIS along with their joint petitions. On October 7, 2005, Stewart and FN attended an interview in support of the petitions at the Boston office of USCIS, where they both intentionally created the impression that they entered into their marriage in good faith, lived together, and intended to establish a life together. Based on the written and verbal information they provided, USCIS granted their petitions and granted FN conditional residency. In February of 2006 and March of 2007, Stewart and FN signed and filed joint tax returns for 2005 and 2006, respectively, listing themselves as spouses and listing Stewart's daughter as a dependent. In June of 2006, Stewart signed a residential lease extension indicating that she and FN continued to live together in Lowell, Massachusetts; in April of 2007, she signed a lease indicating that she and FN had rented an apartment in Dracut, Massachusetts. On June 22, 2007, Stewart and FN signed USCIS Form I-751, seeking to have the conditions on FN's residency lifted. They submitted their 2005 and 2006 tax returns and the leases in support of their application. At some point, the I-751 petition was withdrawn. In addition to the agreed-upon $4,000, FN provided

Stewart $100 per month through at least November 2009 to help support Stewart and her daughter.

Neither party sought to introduce additional evidence aside from the stipulated facts and exhibits. In post-trial briefing, Stewart argued that the government had failed to prove beyond a reasonable doubt that the object of the conspiracy consisted of anything beyond procuring the 2005 change in residency status and the payment of $4,000 to Stewart. She contended that, because the conspiratorial objective was achieved with FN's attainment of conditional LPR status, the filing of Form I-751 was not in furtherance of the conspiracy. Because, the argument continued, FN was granted conditional LPR status nearly six years before the grand jury returned the indictment, the government had not met its burden of proving that she had committed any overt act within the five-year limitations period. The district court disagreed, and found her guilty as charged in the indictment. This appeal followed.

## II. Analysis

The central question raised in this appeal is whether the district court correctly found that the filing of Form I-751 was an overt act committed in furtherance of the objects of the conspiracy as alleged in the indictment. Stewart argues that the district court erred in denying her motion to dismiss on limitations

grounds, a ruling we review de novo, see United States v. Bucci, 582 F.3d 108, 115 (1st Cir. 2009).

The conspiracy statute under which Stewart was charged provides that:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Because § 371 does not include a statute of limitations, the general five-year statute of limitations applies. See id. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed."). Where, as here, a conspiracy charge requires proof of an overt act, the government must show that the conspiracy still existed, and that at least one overt act in furtherance of the conspiracy was committed, during the limitations period. Grunewald v. United States, 353 U.S. 391, 396–97 (1957); see also Fiswick v. United States, 329 U.S. 211, 216 (1946) (limitations period begins running as of the date of the last overt act in furtherance of the conspiracy's objects); United States v. Ferris, 807 F.2d 269, 272 (1st Cir. 1986) (government bears the burden of establishing that the indictment was issued within the limitations period). Thus, "the

crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." Grunewald, 353 U.S. at 397.

At the indictment stage, the government need not "show," but merely must allege, the required elements. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy." United States v. Eirby, 262 F.3d 31, 37-38 (1st Cir. 2001). The indictment's allegations are assumed to be true, and "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." United States v. Guerrier, 669 F.3d 1, 3-4 (1st Cir. 2011).

The indictment here was returned on September 22, 2011, and filed the next day. Thus, we will assume that September 23, 2006, is the critical date after which the indictment must have alleged the commission of at least one overt act in furtherance of

the conspiracy.[2]   The district court correctly held that the indictment did so: it alleged that, "[o]n June 22, 2007, [Stewart] traveled from Maine to Massachusetts and signed the Form I-751, Petition to Remove Conditions of Residency, on FN's behalf.  This form was thereafter filed with [USCIS]."

On appeal, Stewart revives her argument that the indictment should have been dismissed because the conspiratorial object was achieved on October 7, 2005, when FN attained conditional LPR status, and any subsequent acts could not have been in furtherance of an already-completed conspiracy.  However, at the motion-to-dismiss stage, the allegations are taken as true, leaving for the jury the questions of the actual scope of the conspiratorial agreement, whether the acts alleged actually occurred, and, if so, whether they furthered the conspiracy's objectives.  See United States v. Upton, 559 F.3d 3, 11 (1st Cir. 2009) ("Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury.").  Here, whether Stewart's agreement encompassed the removal of the conditions on FN's LPR status was not appropriate for resolution at the motion-to-dismiss stage.

---

[2] See United States v. Hoffecker, 530 F.3d 137, 157 (3d Cir. 2008) (an indictment is "found" within the meaning of § 3282(a) when it has been returned by the grand jury and filed); United States v. Srulowitz, 819 F.2d 37, 40 (2d Cir. 1987) (same).

To the extent that Stewart raises a separate sufficiency-of-the-evidence argument (and it is not clear from her briefing that she does), we reject that argument as well. "We review the evidence and all the reasonable inferences that arise therefrom in the light most favorable to the verdict." United States v. Dellosantos, 649 F.3d 109, 111 (1st Cir. 2011).[3]

After reviewing the parties' stipulations and post-trial memoranda, the district court found Stewart "guilty as charged as set forth in the indictment." The district court, by necessary implication, accepted the government's contention that the conspiracy's objectives were not achieved when FN first received conditional LPR status. Stewart argues that conditional LPR status is the "change of United States immigration status to which [FN] would not otherwise have been entitled" contemplated by the indictment. Thus, she claims, removal of conditions would not effect a "change in status," and seeking such removal could not be in furtherance of the conspiracy. In support of this argument, Stewart cites inapplicable statutes and distinguishable caselaw.

First, she points to 8 U.S.C. § 1255(b), which, she contends, is the law that governs the time when a person's status

---

[3] We will assume, in light of the unusual proceedings below -- a bench trial solely on a stipulated record -- that Stewart preserved this issue by arguing in her post-trial brief that the statute of limitations barred her conviction. Treating this request as the functional equivalent of a motion for acquittal, we review her sufficiency claim de novo. See Dellosantos, 649 F.3d at 115.

is adjusted.  However, § 1255(d) states that aliens, like FN, who were granted conditional LPR status on the basis of marriage under 8 U.S.C. § 1186a may not be granted unconditional LPR status under § 1255's general LPR program.  See Gallimore v. Attorney Gen., 619 F.3d 216, 229 n.11 (3d Cir. 2010).  Section 1186a provides that "an alien spouse . . . shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this section."  8 U.S.C. § 1186a(a)(1).  In order to remove the conditional basis, the couple must, within the ninety-day period before the second anniversary of the grant of conditional LPR status, file a joint petition averring, inter alia, that the marriage "was not entered into for the purpose of procuring an alien's admission as an immigrant."  Id. § 1186a(c)(1)(A), (d)(1)(A)(i)(III), (d)(2)(A).  They must also appear for a personal interview with USCIS.  Id. § 1186a(c)(1)(B), (d)(3).  If the couple fails to comply with these requirements, or if USCIS makes an adverse determination on the petition, the alien's permanent resident status is terminated and he is subject to removal.  Id. §§ 1186a(c)(2)(A), (3)(C), 1227(a)(1)(D)(i).  This petition -- Form I-751 -- was a necessary step in achieving the conspiratorial objective of helping FN acquire an immigration status to which he would not otherwise have been entitled.  Stewart would have the court narrowly define "immigration status" to refer

only to conditional LPR status. However, while receipt of conditional LPR status is surely a change in status, the immigration process involves multiple changes in status up through, ultimately, naturalization and citizenship.[4] The term "immigration status," as used in the indictment, is broad enough to encompass steps taken subsequent to receipt of conditional LPR status, including removal of that conditional basis.[5]

---

[4] Aside from the removal-of-conditions process, "the rights, privileges, responsibilities and duties which apply to all other lawful permanent residents apply equally to conditional permanent residents," 8 C.F.R. § 216.1, but that does not mean that removal of conditions is not a change in status or, at minimum, a step toward a subsequent change in status.

[5] At oral argument, Stewart raised, for the first time, an argument based on the fact that § 1186a allows, in certain circumstances, waiver of the joint petition and interview. See 8 U.S.C. § 1186a(c)(4); see also, e.g., Kinisu v. Holder, 721 F.3d 29, 31–32 (1st Cir. 2013) (describing statutory framework). On this basis, she claims that the marriage was not essential to the removal of conditions and thus signing the I-751 was beyond the scope of the conspiracy. Even if this argument were properly before us, it is unpersuasive: just because a conspiratorial objective could have been achieved via different means does not suggest that the means selected were not in furtherance of the conspiracy.

Also at oral argument, Stewart cited United States v. Rojas, 718 F.3d 1317 (11th Cir. 2013) (per curiam), for the proposition that the offense was complete at the time the marriage occurred. Rojas is inapt; the offense charged there was marriage fraud, not conspiracy. See id. at 1319. The relevant statutory language, making it an offense to "knowingly enter[] into a marriage for the purpose of evading any provision of the immigration laws," 8 U.S.C. § 1325(c), necessarily means that the crime is complete upon "enter[ing]" the marriage and "cannot plausibly be read to require that a defendant take the additional step of filing for immigration benefits in order for the crime to be complete," Rojas, 718 F.3d at 1320.

Stewart urges this court to follow the Second Circuit's decisions in United States v. Roshko (Roshko I), 969 F.2d 1 (2d Cir. 1992), and United States v. Roshko (Roshko II), 969 F.2d 9 (2d Cir. 1992). There, Meir Roshko entered into a sham marriage with a U.S. citizen, received his green card, terminated his sham marriage, and married Irene Roshko with the intent of using his new status as the basis for adjusting Irene's status. Roshko II, 969 F.2d at 10. The court held that the conspiracy prosecution was time-barred because only the divorce and remarriage occurred within the limitations period; the conspiracy's objective, as alleged in the indictment, was limited to changing Meir's immigration status. Id. at 11; Roshko I, 969 F.2d at 5-6. Therefore, while the termination of Meir's sham marriage and marriage to Irene may have been in furtherance of changing Irene's status, these acts could not be said to have been in furtherance of the conspiracy alleged. Roshko II, 969 F.2d at 11. But see United States v. Ramos Algarin, 584 F.2d 562, 569 (1st Cir. 1978) (sham marriage arranger's act of obtaining divorce terminating sham marriage was overt act in furtherance of "entire plan to obtain resident alien status" for immigrant-spouse). Although Roshko II held that the conspiracy terminated with Meir Roshko's receipt of his green card, the prosecution proceeded on a theory that the conspiratorial object

was his receipt of a green card.[6] Roshko I, 969 F.2d at 2. Here, the prosecution's theory was not similarly limited, and the Roshko cases thus say nothing about whether an I-751 petition furthers the objective of obtaining a change in immigration status.

Finally, Stewart argues that, even if signing the I-751 was an overt act in furtherance of the conspiracy, she affirmatively withdrew the form in September of 2011, and thus abandoned the conspiracy. There are several problems with this argument. First, it was not raised before the district court and thus is not properly before us. See United States v. Nee, 261 F.3d 79, 86 (1st Cir. 2001) ("It is a cardinal principle that [i]ssues not squarely raised in the district court will not be entertained on appeal." (citation and internal quotation marks omitted)) (alteration in original). Second, it lacks evidentiary support. The stipulation states simply that the form was withdrawn; it does not state when or by whom. Third, mere withdrawal of the I-751 is insufficient to constitute abandonment of the conspiracy, which

---

[6] Moreover, Roshko's receipt of his green card in 1984 preceded the passage of the Immigration Marriage Fraud Amendments of 1986, Pub. L. 99-639, 100 Stat. 3537, which, among other things, introduced the two-year conditional basis now attached to LPR status obtained via marriage under § 1186a. See Gallimore, 619 F.3d at 222. "The purpose of this scheme is obvious: to ferret out sham marriages entered into for the purpose of obtaining entry into the United States." Id. Before the Amendments, a non-citizen spouse automatically received unconditional LPR status upon marrying a citizen. See Carpio v. Holder, 592 F.3d 1091, 1094 (10th Cir. 2010). Thus, when Roshko received his green card, the conspiratorial objective of receiving his green card was quite obviously achieved.

requires that the conspirator "act affirmatively either to defeat or disavow the purposes of the conspiracy, such as by confessing to the authorities or informing his coconspirators that he has forsaken the conspiracy and its goals." <u>United States</u> v. <u>Mehanna</u>, 735 F.3d 32, 57 (1st Cir. 2013) (citation and internal quotation marks omitted). Finally, even if Stewart did abandon the conspiracy in 2011, that would mean only that she would not be liable for post-abandonment conduct of her co-conspirators. <u>See</u> <u>United States</u> v. <u>Guevara</u>, 706 F.3d 38, 45–46 (1st Cir. 2013). Withdrawal within the statute of limitations period does not shield a conspirator from liability for pre-withdrawal acts. <u>Id.</u> at 46 & n.8. Thus, Stewart's purported withdrawal offers her no protection.

## III.  Conclusion

For the foregoing reasons, we <u>affirm</u> Stewart's conviction.