# United States Court of Appeals
## For the First Circuit

No. 15-2089

UNITED STATES OF AMERICA,

Appellee,

v.

LUZANDER MONTOYA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Burroughs,* District Judge.

Andrew Levchuk, with whom Bulkley, Richardson and Gelinas, LLP was on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

December 19, 2016

---

*Of the District of Massachusetts, sitting by designation.

**SELYA**, **Circuit Judge**.  When a person is caught red-handed in the commission of a crime, assiduous defense counsel often is tempted to consider an entrapment defense.  In the case before us, the defendant followed this course — but things did not go well for him.  Among his other plaints, the defendant insists that the district court forced him to show his hand prematurely.  And to make a bad situation worse, the court — at the conclusion of all the evidence — ruled that the defendant had not carried his entry-level burden of producing sufficient evidence to send the entrapment defense to the jury.

Following an adverse jury verdict and the imposition of sentence, the defendant now appeals.  Ably represented, he advances several claims of error.  After careful consideration, we affirm.

## I.  BACKGROUND

We start with an overview of the case, reserving pertinent details for our ensuing discussion of specific issues.

On three occasions in the summer and fall of 2012, defendant-appellant Luzander Montoya sold heroin to a person surreptitiously cooperating with the federal government.  A federal grand jury subsequently returned an indictment charging the defendant with three counts of possessing heroin with intent to distribute.  See 21 U.S.C. § 841(a)(1). After a five-day trial, a jury found the defendant guilty on all three counts.  The district court imposed a 132-month term of immurement and denied

the defendant's motion for a new trial. This timely appeal followed.

## II. DISCUSSION

We subdivide our discussion of the issues into four segments, corresponding to the defendant's asseverational array.

### A. **The Entrapment Defense.**

The defendant's principal claim is that the district court erred in refusing to instruct the jury on entrapment. Because the court grounded this refusal in what it perceived to be the insufficiency of the relevant evidence, we review its ruling de novo, examining the record in the light most favorable to the defendant. See United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008).

A defendant must make a two-part threshold showing in order to put an entrapment defense before the jury. First, he must adduce some evidence "that the government induced the commission of the charged crime." Id. at 14. Second, he must adduce some evidence that he "lacked a predisposition to engage in [that crime]." Id. In short, the defendant has an entry-level burden of production, which requires him to furnish "'some hard evidence' that 'governmental actors induced [him] to perform a criminal act that he was not predisposed to commit.'" Id. (alteration in original) (quoting United States v. Rodriguez, 858 F.2d 809, 814 (1st Cir. 1988)).

If — and only if — the defendant makes this required "prima facie showing," id., the issue of entrapment is teed up to go to the jury. See United States v. Ramos-Paulino, 488 F.3d 459, 462 (1st Cir. 2007); United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987). Once that prima facie showing has satisfied the defendant's entry-level burden of production, the government must shoulder the burden of proving beyond a reasonable doubt that entrapment did not occur. See Coady, 809 F.2d at 122.

Against this backdrop, we turn first to the defendant's claim that he made a prima facie showing of improper inducement. On its face, this claim does not look promising: while the cooperating witness (the CW) approached the defendant seeking to buy heroin, the law is settled that merely showing that the government presented a person with an opportunity to commit a crime is not enough to show improper inducement. See United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013); see also United States v. Díaz-Maldonado, 727 F.3d 130, 139 (1st Cir. 2013) (differentiating between "government inducement" and "improper government inducement"). Beyond showing that the government afforded him the opportunity to commit the crime, the defendant must adduce evidence that the government engaged in some kind of "overreaching conduct." Díaz-Maldonado, 727 F.3d at 138. Such conduct might include, for example, intimidation, threats,

- 4 -

relentless insistence, or excessive pressure to participate in a criminal scheme. See id. at 137.

To lay the groundwork for a finding that the government did more than create an opportunity for the commission of a crime, a defendant may identify "plus" factors — factors that suffice to transform run-of-the-mill stage-setting into improper government inducement. See Guevara, 706 F.3d at 46; United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994). The defendant strives to identify several such factors. To begin, he notes that he and the CW were friends and suggests that the government played upon this friendship to lure him into wrongdoing that he otherwise would have eschewed. Next, he suggests that the CW's references to his (the CW's) heroin addiction prompted the defendant to make the sales out of sympathy. Neither of these suggestions qualifies as a "plus" factor.

The mere existence of friendship, in and of itself, does not constitute improper inducement. See United States v. Young, 78 F.3d 758, 761-62 (1st Cir. 1996). Friendship becomes relevant to this inquiry only if the defendant can show that the government cooperator so appeals to friendship as to cause a non-predisposed defendant to commit the crime. In other words, there must be an "accompanying allegation of coercion, threat, or plea based upon friendship . . . that would constitute more than mere opportunity." Id. at 762; see United States v. González-Pérez, 778 F.3d 3, 12

- 5 -

(1st Cir.), cert. denied, 135 S. Ct. 1911 (2015) (finding no prima facie showing of improper inducement when defendant "cite[d] no evidence indicating that [the government cooperator] solicited his participation by appealing directly to their friendship"); Díaz-Maldonado, 727 F.3d at 138 (similar). Here, the defendant presented evidence indicating that he and the CW were friends; he presented no evidence, though, indicating that the CW appealed to this friendship to get the defendant to sell him heroin. On this record, a jury could have found that the CW betrayed the defendant, but not that he improperly induced the defendant into committing the crime.

This leaves the defendant's suggestion that the CW's heroin addiction constituted a "plus" factor. Although the CW used his addiction as one of the reasons that he was seeking to purchase heroin, that passing reference to addiction did not suffice to create a "plus" factor. See Young, 78 F.3d at 761-62. There must be some evidence that the government cooperator used his addiction either to engender sympathy or to create a sense of urgency, cf. Gendron, 18 F.3d at 961 (noting that improper inducement might be found when the government took unfair advantage of defendant's sympathy for cooperator's withdrawal symptoms), and the defendant introduced no such evidence here. In fact, the record contains more references to the CW's ostensible attempts to resell the defendant's heroin than to the CW's purported addiction.

The defendant attempts to mitigate the effect of his lack of inducement evidence by blaming the government. To put this argument in perspective, some additional facts are needed.

While the government was targeting the defendant in the summer and fall of 2012, the defendant and the CW communicated in person, over the telephone, by text, and perhaps over Facebook. The defendant alleges that the government did not preserve complete records of all of these communications and posits that its failure gives rise to an inference of spoliation, which should be counted as an additional "plus" factor.

It is undisputed that the government did not retain complete records of the CW's telephone calls with the defendant (even though a government agent agreed at trial that it "would have been good" to do so). In addition, the defendant elicited testimony from the same government agent regarding the failure to preserve records of any messages that the defendant and the CW might have exchanged on Facebook. The agent acknowledged that the CW had used Facebook to communicate with other targets of the investigation. He testified, though, that he did not know whether the CW had ever used Facebook to communicate with the defendant and, as a result, he did not request records from the CW's Facebook account when building a case file. The agent added that if any such contacts ever occurred, the records were lost when he instructed the CW to erase his Facebook account as a safety

precaution before the CW's planned entry into the witness protection program.

The defendant argues that the failure to preserve any Facebook messages and the entirety of the call logs should give rise to an inference of spoliation and, thus, serve as an additional "plus" factor. His argument appears to be that, had the government retained the records, he might have found some evidence of improper inducement. For instance, he might have been able to use the records to identify a "little link in the chain" that would help to get the inducement issue to the jury. The district court disagreed, and so do we.

What transpired here cannot plausibly be regarded as a "plus" factor. Such factors derive from affirmative evidence; merely identifying the absence of affirmative evidence does not create a "plus" factor. See Guevara, 706 F.3d at 46-47; Gendron, 18 F.3d at 961-62.

In all events, even if an inference of spoliation could constitute a "plus" factor — a matter that we need not resolve — no such inference is warranted here. An inference of spoliation is appropriate "where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other." United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010). However, negligent destruction of evidence

is generally insufficient to justify a spoliation instruction; some indication of bad faith is required. See id. at 902-03.

Even assuming that the missing call logs and Facebook messages might have contained favorable evidence, an inference of spoliation would still not be justified because the defendant adduced no evidence suggesting that the government neglected to preserve the records in bad faith. The opposite is true: the failure to retain call logs was at most careless, and — considering the CW's imminent entry into the witness protection program — there was good reason for scrubbing his Facebook account. In fact, with respect to both the call logs and the Facebook messages, the defendant's lawyer acknowledged at trial that he did not think that "there was any bad faith on anyone's part."[1]

The short of it is that the district court did not err in holding that the defendant failed to make a prima facie showing of inducement. Because the two requirements for a prima facie showing of entrapment are conjunctive, that is, the defendant must carry his entry-level burden of production as to both improper

---

[1] The defendant argues in passing that the district court's failure to charge the jury concerning an inference of spoliation constituted instructional error. That argument is specious. The defendant did not request such an instruction at trial, nor did he object when the court did not give one. As a result, we review this argument only for plain error. See Fed. R. Crim. P. 30(d) (citing Fed. R. Crim. P. 52(b)); United States v. McPhail, 831 F.3d 1, 9 (1st Cir. 2016); United States v. Paniagua-Ramos, 251 F.3d 242, 245-46 (1st Cir. 2001). For reasons already alluded to, see text supra, there was no error, plain or otherwise.

inducement and lack of predisposition, see Shinderman, 515 F.3d at 14, no more is exigible to uphold the district court's refusal to send the entrapment defense to the jury. In the interest of completeness, however, we add a few words about the defendant's failure to make a prima facie showing of lack of predisposition.

In determining predisposition or the lack of it, we consider how the defendant "likely would have reacted to an ordinary opportunity to commit the crime." Gendron, 18 F.3d at 962. Relatedly, we look for evidence indicating that the defendant was an unlikely candidate to commit the crime before the government approached him. See United States v. Joost, 92 F.3d 7, 14 (1st Cir. 1996) (citing Jacobson v. United States, 503 U.S. 540, 550 (1992)).

The defendant asserts that "the government . . . had no information" that he was selling drugs in July of 2012 and insists that he was otherwise gainfully employed with no reason to engage in the drug trade. But the evidence of the defendant's lawful employment was dwarfed by a surfeit of evidence indicating that the defendant had previously been convicted of at least one drug-trafficking offense and was actively engaged in the drug trade when the CW first approached him. This evidence includes statements from the defendant regarding other customers, statements regarding his drug inventory and his periodic need to

replenish it, and statements indicating that he had a direct pipeline with at least one supplier.

The record is likewise barren of any evidence that pressure was needed to persuade the defendant to sell the heroin. To the contrary, he frequently initiated contact with the CW. Before the second sale, the defendant even offered to sell the CW a particular brand of heroin that the defendant considered better quality than the last. These are indicia of predisposition, not indicia of a lack of predisposition. See Rodriguez, 858 F.2d at 815. In sum, a reasonable factfinder, assessing this evidence in its totality, could not have found that the defendant had made a prima facie showing of lack of predisposition. See Shinderman, 515 F.3d at 14.

That ends this aspect of the matter. We hold that the district court did not err in refusing to charge the jury on entrapment.

### B.  The Forced Disclosure Claim.

The defendant has a fallback position. He complains that the district court "forc[ed] the defense to disclose," prior to trial, the defendant's plan to present an entrapment defense. Since the defendant failed to preserve this plaint below, our review is for plain error. See Puckett v. United States, 556 U.S. 129, 134-35 (2009). Under this stringent standard, the defendant must show "(1) that an error occurred (2) which was clear or

- 11 -

obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

We start with the relevant facts.  The defendant submits that, at a pretrial hearing held in April of 2015, the district court "compell[ed] the defense to give notice of an entrapment defense," thereby "graft[ing] a new requirement" onto the Federal Rules of Criminal Procedure.[2]  The record, though, belies this self-serving account.

At the pretrial hearing, the prosecutor told the district court that "the defendant has suggested that he is going to raise an entrapment defense."  The prosecutor then asked whether the government would be allowed to discuss entrapment in its opening statement.  The court turned to defense counsel and inquired whether he would know, prior to making his own opening statement, if he would say anything about entrapment.  Defense counsel responded that he was not currently planning to mention entrapment in his opening statement, but added, "If I change my mind, I'll let the government know."  In light of this reply, the

---

[2] The Criminal Rules do require that defendants furnish advance notice of certain specified defenses.  See, e.g., Fed. R. Crim. P. 12.1 (alibi), 12.2 (insanity), 12.3 (acting under public authority).  Entrapment is not one of these enumerated defenses.

court directed defense counsel to "notify the government" of his decision by the end of the week.  Defense counsel did not object.

Given this sequence of events, it is surpassingly difficult to say that the district court "forc[ed]" the defense to disclose its theory of the case prematurely.  The defendant, through counsel, had already volunteered to let the prosecutor know if he was going to mention entrapment in his opening statement.  What is more, the defendant had laid his cards on the table for all to see: he had moved to dismiss the indictment on the ground of entrapment almost a year before and had stated, in an earlier pretrial motion, that "the government has been on notice for the past year that [the defendant] was considering an entrapment defense at trial."

Under these circumstances, we find no unwarranted compulsion: the court was merely attaching a timeline to defense counsel's offer.  If there was error at all — a matter on which we take no view — the error was not "clear or obvious."  Duarte, 246 F.3d at 60.  Nor was there any likelihood that, given both the defendant's decision to press forward with an entrapment defense and his subsequent failure to make out that entrapment defense, the error (if one occurred) in any way "affected the defendant's substantial rights."  Id.  We hold, therefore, that the district court did not plainly err in directing defense counsel to follow through, by a date certain, on counsel's volunteered commitment to

- 13 -

advise the prosecutor about the defendant's intent to mention entrapment in his opening statement.

## C.  **The Delayed Disclosure of Brady Material.**

Next, the defendant submits that he was prejudiced by the government's delayed disclosure of exculpatory evidence and, thus, is entitled to a new trial.  We review the district court's refusal to order a new trial on this basis for abuse of discretion.[3] See United States v. Van Anh, 523 F.3d 43, 51 (1st Cir. 2008) (citing United States v. Casas, 425 F.3d 23, 43 (1st Cir. 2005)).

In a criminal case, the government bears an "affirmative duty to disclose evidence favorable to a defendant."  Kyles v. Whitley, 514 U.S. 419, 432 (1995) (citing Brady v. Maryland, 373 U.S. 83, 86 (1963)).  If the government fails to disclose this so-called Brady material in a timeous manner, the defendant may be entitled to relief.  See United States v. Flores-Rivera, 787 F.3d 1, 17-18 (1st Cir. 2015); United States v. Lemmerer, 277 F.3d 579, 587-88 (1st Cir. 2002).  Everything depends on the circumstances.

A key circumstance is whether the delayed disclosure prejudiced the defendant.  See United States v. Sepulveda, 15 F.3d 1161, 1179 (1st Cir. 1993).  To secure relief, the defendant must

---

[3] The government complains that this claim of error was not properly preserved and, therefore, engenders plain error review. Because we find no abuse of discretion, we bypass the government's complaint and assume, albeit without deciding, that the defendant sufficiently preserved his claim.

show a "reasonable probability that the outcome of his case would have been . . . different" had the material been disclosed in a timely manner.  United States v. Delgado-Marrero, 744 F.3d 167, 199 (1st Cir. 2014).

In the case at hand, the defendant asserts that he was prejudiced by the government's delayed disclosure of Brady material.  The facts are straightforward.  On the third day of the trial, the government disclosed to the defendant, for the first time, its reports of its initial interviews with the CW.  According to those reports, government agents asked the CW to describe all of the illegal activity of which he was aware.  In response, the CW identified more than thirty people with connections to gangs and drug-trafficking in western Massachusetts — but he did not mention the defendant.  In the defendant's view, these reports are exculpatory because the omission of his name suggests that the defendant was not actively dealing drugs when the government targeted him.

We assume, favorably to the defendant, that the reports were Brady material and that the government was obligated to produce them before trial.  Even so, the defendant has failed to show that the delayed disclosure of the reports prejudiced him: nothing about the timing inhibited the defendant from using the disclosed material effectively.

We need not tarry. When all was said and done, the defendant was able to use the reports for the very purpose that he now says was thwarted. After the reports were produced mid-trial, the defendant elicited testimony from the government agent that the CW did not mention the defendant in his initial interviews. Defense counsel reiterated this fact as part of his closing argument. There is no reason to believe that a timely disclosure would have enabled the defendant to use the reports differently or to greater effect. Consequently, the delayed disclosure did not justify granting the defendant's motion for a new trial. See Lemmerer, 277 F.3d at 588 (holding that because "defense counsel incorporated [late-produced documents] ably into" the defense, the late disclosure did not violate Brady).

The defendant does not go quietly into this bleak night. He argues that, had he received the material earlier, his attorney could have used the reports to impeach the CW. This argument is empty: defense counsel received the material before the CW took the stand, and he had an unfettered opportunity to cross-examine the CW about their contents. To cinch the matter, the jury was fully apprised on several occasions that the CW did not name the defendant in his initial canvass. Given this known information, the defendant has not explained how impeachment on cross-examination would have yielded a reasonable probability of a different result. In view of the mass of other evidence against

- 16 -

him, any hope of a different result seems farfetched.  See Sepulveda, 15 F.3d at 1179 (finding no prejudice where, "[i]n comparison to what was already known," the delayed disclosure of a "relatively inconsequential amount of incremental information[] comprised small potatoes").

So, too, the defendant's vague suggestion that his "defense theory might have had an entirely different cast" had he received the reports earlier is wholly speculative.  He has not put any flesh on these bones; that is, he has not made the necessary "prima facie showing of a plausible strategic option which the delay foreclosed."  Delgado-Marrero, 744 F.3d at 200 (emphasis omitted) (quoting Lemmerer, 277 F.3d at 588).

To say more on this point would be supererogatory.  We hold that the court below did not abuse its discretion in refusing to grant a new trial based on the delayed disclosure of Brady material.

### D.  **The Challenged Sentence.**

The last stop on our itinerary brings us to the defendant's claim that he should not have been sentenced as a career offender under USSG §4B1.1.  This claim engenders de novo review.  See United States v. Whindleton, 797 F.3d 105, 108 (1st Cir. 2015), cert. dismissed, 137 S. Ct. 23 (2016), and cert. denied, 137 S. Ct. 179 (2016).

- 17 -

The sentencing guidelines call for a career offender enhancement when, among other things, a defendant has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG §4B1.1(a). A court tasked with determining whether a particular conviction qualifies as a career offender predicate must employ a categorical approach, taking into account "the elements of the statute of conviction" and not the specifics of the defendant's conduct. Taylor v. United States, 495 U.S. 575, 600-01 (1990).

In this instance, the defendant had a checkered past, and his criminal record included a number of prior convictions. Two of these convictions are relevant here. First, the defendant has a prior state conviction for cocaine distribution. See Mass. Gen. Laws ch. 94C, § 32E. Second, the defendant has a prior state conviction for assault with a dangerous weapon (ADW). See Mass. Gen. Laws ch. 265, § 15B(b).

The district court found these two offenses sufficient to serve as predicate offenses under the career offender guideline. The first of these is unarguably a conviction for a controlled substance offense and, thus, a proper predicate offense under the career offender guideline. See USSG §4B1.2(b) (defining "controlled substance offense"). The second conviction — for Massachusetts ADW — is less clear-cut. The district court nonetheless found it to be a crime of violence. See id. §4B1.2(a)

- 18 -

(defining "crime of violence").  The applicability of the career offender guideline depends on the vitality of the defendant's challenge to this finding.

Section 4B1.2(a) supplies a built-in definition for the term "crime of violence."  The definition in effect when the defendant was sentenced described a "crime of violence" in relevant part as a federal or state felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another."  USSG §4B1.2(a)(1) (Nov. 2014 ed.).  This subcategory of the definition, commonly known as the "force clause," United States v. Fields, 823 F.3d 20, 33 (1st Cir. 2016), is apposite here.[4]

In Whindleton, we held that a conviction for Massachusetts ADW, categorically viewed, is a conviction for a violent felony under the force clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(i).  See Whindleton, 797 F.3d at 112, 116.  The force clause of the career offender guideline's "crime of violence" definition mirrors the force clause of the ACCA's "violent felony" definition and, on that basis, we have

_____

[4] A different subcategory of the definition, commonly known as the "residual clause," Fields, 823 F.3d at 33, is irrelevant here. For that reason, we have no occasion to address whether and to what extent Johnson v. United States (Johnson II), 135 S. Ct. 2551, 2557 (2015), may apply either to the career offender guideline or to sentences imposed thereunder.

extended Whindleton's reasoning to the career offender guideline. See Fields, 823 F.3d at 35.

The defendant invites us to reconsider Whindleton and Fields. We decline his invitation: where, as here, "a claim runs headlong into circuit precedent," the "law of the circuit doctrine" requires us to respect that precedent.[5] United States v. Hudson, 823 F.3d 11, 14-15 (1st Cir. 2016).

Whindleton and Fields are directly on point. They remain good law. See, e.g., United States v. Tavares, ___ F.3d ___, ___ (1st Cir. 2016) [No. 14-2319, slip op. at 26-27]. We are therefore duty-bound to follow these precedents. Applying them, we hold that the defendant was lawfully sentenced as a career offender.

We add a coda. Our recent decision in Tavares does not in any way impugn this holding. There, we considered whether a Massachusetts conviction for assault and battery with a dangerous weapon (ABDW) under Mass. Gen. Laws ch. 265, § 15A(b) was a crime of violence within the meaning of the career offender guideline. See Tavares, ___ F.3d at ___ [No. 14-2319, slip op. at 23]. We

---

[5] To be sure, there are isthmian exceptions to the law of the circuit doctrine. See San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010). For example, the doctrine does not apply when "the holding of a previous panel is contradicted by controlling authority, subsequently announced (say, a decision of the authoring court en banc, a Supreme Court opinion directly on point, or a legislative overruling)." United States v. Rodríguez, 527 F.3d 221, 225 (1st Cir. 2008). No such exception pertains here.

held that Massachusetts ABDW was divisible and that a conviction under the first section — defined in state case law as "the intentional and unjustified use of force upon the person of another, however slight" — would qualify as a crime of violence. Id. at 27 (citation omitted); see also id. at 37. This holding explicitly relied on Whindleton, so Tavares does not undermine Whindleton but, rather, reaffirms it. See id. at 26-27.

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, the defendant's conviction and sentence are

**Affirmed.**