# United States Court of Appeals
## For the First Circuit

Nos. 22-1982
     23-1112
     23-1133

UNITED STATES,

Appellee,

v.

ANTHONY RIVERA-RIVERA; VICTOR M. HERNÁNDEZ-CARRASQUILLO; JIMMY
RÍOS-ALVAREZ, a/k/a Pi,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe, Circuit Judges.

Jason González-Delgado for appellant Anthony Rivera-Rivera.
Miguel Oppenheimer for appellant Victor M.
Hernández-Carrasquillo.
Lydia Lizarribar Masini for appellant Jimmy Ríos-Alvarez.
Ricardo A. Imbert-Fernández, Assistant United States
Attorney, with whom W. Stephen Muldrow, United States Attorney,
and Mariana E. Bauzá-Almonte, Assistant United States Attorney,
Chief, Appellate Division, were on brief, for appellee.

July 25, 2025

**MONTECALVO, <u>Circuit Judge</u>.** At a joint trial, a jury convicted Anthony Rivera-Rivera, Victor M. Hernández-Carrasquillo, and Jimmy Ríos-Alvarez of one count of armed carjacking, in violation of 18 U.S.C. §§ 2, 2119(2), and one count of using a firearm in a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1)(a)(ii). The appeals have been consolidated.

In this case, the three appellants were part of a larger group that committed a planned home invasion, which became increasingly violent. Two other members of the group ended up stealing a car. The appellants' central argument on appeal is that they are guilty of state robbery charges but lacked the necessary intent and knowledge to be guilty of the federal carjacking committed by their codefendants.

Rivera claims additional errors related to a delayed <u>Brady</u> disclosure and the court's subsequent denial of severance. He also alleges that the Confrontation Clause was violated when two members of the family targeted in the home invasion testified about what a third family member, who did not testify, saw and experienced. Finally, Rivera and Hernández challenge the reasonableness of their sentences.

For the following reasons, we affirm.

## I. Background

### A. Facts

We recount the facts relevant to the appellants' sufficiency challenge in the light most favorable to the prosecution and provide a neutral summary of the facts relevant to any other claims. See United States v. Díaz-Rosado, 857 F.3d 116, 117 (1st Cir. 2017).

### 1. Preparing for the Home Invasion

Wilmed Suárez-Diaz planned the home invasion that took place on August 10, 2015. He decided to target a family in a two-story house because he thought they might have money from their nearby dairy farm. Five people joined Suárez in the break-in: Jeremy Guzmán-Fuentes, José Correa-Adorno, and the three appellants -- Rivera, Hernández, and Ríos.[1] The six associates,[2] along with several unindicted acquaintances, drove in two cars to a supermarket parking lot two minutes away from the house. The six associates got into a single car, a Mitsubishi Lancer (the "Mitsubishi"), and drove to the house. The unindicted

_____

[1] The codefendants (or "associates," infra note 2) are referred to by the first of their two family names. The family members who were targeted in this home invasion are referred to by their first names for clarity.

[2] Where the trial testimony is unclear as to who committed a particular act, we use the terms "associate" and "associates" to refer to the group generally. Because much of the trial testimony used the term "they," we sometimes use "associates" even where it is likely that only one person committed the act.

acquaintances stayed in a Suzuki Kizashi (the "Suzuki") "in case [the six associates] needed rescuing or the police got involved." All six men wore face coverings and gloves and carried guns.[3]

## 2. The Home Invasion

Carmen Morales-Gonzalez and her adult son, Antonio Gómez-Morales, were outside their house pruning trees when the Mitsubishi suddenly stopped outside their gate. The six men jumped out. One of them pointed a gun at Antonio's head, and the group forced Carmen and Antonio to run across the long yard into the house. Rivera, who was not wearing a mask, grabbed Carmen's arm and "made [her] run."[4] Carmen's other adult son, Luis Emilio Gómez-Morales, was inside the house, and, upon entering, Ríos grabbed him and forced him upstairs to the second floor.

With all of the family members on the second floor, the associates demanded to know where the money and the safe were. Carmen, who was in the living room, told the men that the family did not keep any money in the house and offered them ATM cards instead. In response, one of the associates pushed her onto the couch.

---

[3] Suárez testified that he was the only man not carrying a gun. However, Ríos told an FBI agent that all six associates had guns.

[4] Suárez testified that he used a shirt to cover his face and the five other associates wore black masks. Carmen testified that Rivera was not wearing a mask. The record does not clarify this discrepancy.

- 4 -

Meanwhile, another associate held a gun to Antonio's head and pushed him into his bedroom, demanding anything of value. The associate did not believe Antonio, who protested that all he had was an ATM card. The man then hit Antonio in the head with the gun, threw him to the ground, kicked him, and left him in the bedroom. When Antonio regained consciousness, he was out in the hallway near the living room in the process of being tied up with tape.

Carmen saw the associates hit Luis Emilio on the head, punch him in his face and chest, and tie him to a chair. She also saw them tie up Antonio, who was on the floor, and kick him every time they went by. The associates taped Luis Emilio's and Antonio's mouths and noses. The brothers could not breathe and began to suffocate. Finally, after Carmen tried to help them, one of the associates cut open the tape with a knife.

Next, the group, including the three appellants, ransacked the house for valuables. Carmen described the group as "incredibly organized" in their search. Three men were upstairs, searching the bedrooms, and two men were downstairs, searching the cars. Appellant Ríos found a revolver, but no one was able to find money. At some point, one associate confronted the family with a box of old cancelled checks, screaming that it was proof that the family must be hiding money, but Luis Emilio explained that they did not have the money from those checks anymore.

The associates became increasingly frustrated that they could not find any money.  At this point, all three family members were in the living room upstairs.  Correa heated oil in a frying pan, and the associates threw it on Antonio's legs.  The men also poured hot oil on Luis Emilio's legs, and Guzmán stabbed Luis Emilio in the thigh.[5]  Both brothers were screaming from the pain. Antonio soon went into shock and stopped feeling anything.

The associates then began discussing what to do.  The group took the valuables they could find (including electronics, cell phones, jewelry, and wallets) and said, "Well, what do we do now?  Do we take the old lady?"  Carmen and Luis Emilio tried to persuade the men to go to an ATM and let the family go.  Luis Emilio convinced the men to take him instead of his mother.  The associates decided to take Luis Emilio in the family's Nissan Frontier (the "Nissan") to the closest ATM machine.

### 3. Alleged Carjacking

Some associates took Luis Emilio downstairs to the Nissan, which was parked near the entrance to the property.  The men forced Luis Emilio into the Nissan, but Suárez took him out of the car.  According to Carmen, "they had [Luis Emilio] at gunpoint . . . until the man came back with the money."

---

[5]  Suárez later claimed to have aided Luis Emilio by immediately applying a tourniquet, although Carmen disputed that anyone had helped her sons.

Guzmán and Suárez drove the Nissan to a nearby gas station, about five to ten minutes away. Correa and appellants Rivera, Hernández, and Ríos stayed behind to guard the three family members. Guzmán called Correa to get the PIN codes for the ATM cards from the family members and then withdrew money. Thereafter, the associates at the house tied up Carmen, who was with Antonio upstairs, before leaving in the Mitsubishi the men had driven to the house.

Guzmán and Suárez drove back towards the house but crossed paths with the rest of their group in the Mitsubishi en route, about ten minutes from the house. Guzmán got into the Mitsubishi, and Suárez drove the Nissan to a housing project, where he left the Nissan and the group parted ways. The record does not indicate how much money Guzmán took out or whether the money was split among the group.

### 4. After the Home Invasion

Back at the house, Carmen managed to untie herself and her sons. Because the group had ransacked the house, the family had to search for car keys before they could leave the house. Carmen described it as a "miracle" when Antonio finally found a set of car keys. Carmen rushed her injured sons to a nearby hospital.

Suárez estimated the home invasion took one or one-and-a-half hours. Carmen estimated that it lasted for more than three hours.

The FBI assisted in the investigation of the incident. Five months later, FBI Special Agent Guillermo Gonzalez asked to speak with Ríos during one of Ríos's meetings with his probation officer. During this conversation on January 29, 2016, Ríos implicated himself in the home invasion. Ríos said that he was at the house during the incident and saw Guzmán and Suárez leave the house in the Nissan to head to an ATM. Ríos told Agent Gonzalez that all of the associates had guns. He also corroborated that Correa had heated the oil and provided the PIN code over the phone to the associates at the ATM machine.

## B. Procedure

Appellants Rivera, Hernández, and Ríos were each indicted on one count of armed carjacking and one count of using a firearm in a crime of violence. See 18 U.S.C. §§ 2, 924(c)(1)(a)(ii), 2119(2).

### 1. Pretrial Motions

Trial was scheduled for May 23, 2022. Less than a week before the scheduled trial date, the government disclosed additional discovery. Rivera and Hernández jointly moved to dismiss the indictment due to alleged Brady violations, contending that some of the new evidence was exculpatory. Ríos also moved to

dismiss the indictment, arguing that the newly disclosed grand jury transcript demonstrated that there had been insufficient evidence to support a determination of probable cause. The district court held a full-day hearing on the multiple motions resulting from the government's disclosures. After reviewing additional briefing, the court denied both motions.

The additional discovery provided in May 2022 included a supplemental interview that the FBI had conducted with Ríos on May 16, 2016. Ríos successfully moved to suppress this interview, arguing that his Miranda rights had been violated.

This suppressed interview, which could not be admitted in Ríos's trial, contained statements exculpating Rivera and Hernández. Rivera and Hernández thus filed a joint motion for severance from Ríos in order to call Ríos as a witness. The court denied the motion to sever.

The parties proceeded to trial on June 28, 2022.

## 2. Trial

At trial, the government presented testimony from Suárez, who had planned the home invasion and organized the group of associates. Suárez described the events that day and the group's increasingly violent search for anything of value. Suárez also identified Rivera, Hernández, and Ríos, all of whom he met for the first time on the day of the incident. Suárez specifically described Ríos as forcing Luis Emilio upstairs at the beginning of

- 9 -

the home invasion. He testified that Ríos, Rivera, and Hernández were each searching the house and that Ríos found a revolver. On cross-examination, Suárez admitted that some of his testimony was inconsistent with prior statements he had made to the FBI.

Carmen and Antonio each testified about the home invasion, but Luis Emilio did not. Rivera's counsel objected several times on the basis of the Confrontation Clause when Carmen and Antonio spoke about what Luis Emilio had seen and experienced.

During her testimony, Carmen identified Rivera and Hernández. Carmen recognized Rivera as the man who had grabbed her and forced her to run into the house. Antonio testified about recognizing a codefendant in a photo lineup but was subsequently unable to identify that person at trial.

FBI Agent Gonzalez testified about his participation in the investigation, including the statements that Ríos made to him during the January 29, 2016 interview.[6] The court instructed the jury to consider testimony about this interview only with regards to Ríos, not Rivera or Hernández.

The government presented testimony from several additional law enforcement witnesses. The government also

---

[6] Agent Gonzalez's testimony about the associates' cars somewhat differed from Suárez's testimony. Agent Gonzalez testified that the Suzuki and Mitsubishi had both been at the residence and were later found together. Agent Gonzalez also testified that Ríos had said that the group brought three vehicles to the house: the Mitsubishi, the Suzuki, and Ríos's Acura.

- 10 -

presented photographs of the house, the sons' injuries, and the valuables that were taken. The government played surveillance video that showed the Nissan arriving at the gas station and Guzmán using the ATM there.

The defense presented testimony from three law enforcement witnesses. Those witnesses testified that Hernández's and Rivera's fingerprints were not matched to any fingerprints taken from the scene. Guzmán's fingerprints were found on two items taken from the Suzuki. Hernández and Rivera were also excluded as possible contributors to DNA taken from the Mitsubishi and the Suzuki. DNA taken from three items found in the Mitsubishi and Suzuki showed possible DNA associations for Ríos, Correa, Guzmán, and Suárez.

The jury found each appellant guilty on both counts.

### 3. Motions for Judgment of Acquittal

At the close of the government's case, the three appellants filed motions for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. After hearing argument, the court denied the motions, concluding that the government had presented sufficient evidence on each element for a rational factfinder to find each appellant guilty beyond a reasonable doubt. The appellants renewed their Rule 29 motions after the defense rested. The court reserved its decision until after the jury verdict and then denied the motions.

- 11 -

## 4. Sentencing

The court sentenced Rivera to an aggregate term of 180 months' incarceration, to be served concurrently with another federal sentence, and 5 years' supervised release. The court sentenced Hernández to an aggregate term of 235 months' incarceration, to be served consecutively to a state sentence, and 5 years' supervised release. Ríos received the same sentence as Hernández.

Rivera, Hernández, and Ríos timely appealed.

## II. Discussion

Rivera, Hernández, and Ríos each challenge the sufficiency of the evidence for both counts. Rivera also claims errors related to the delayed Brady disclosures, the court's denial of severance, and alleged violations of the Confrontation Clause. In addition, Rivera and Hernández challenge their sentences.

We begin with the sufficiency of the evidence before turning to the other claims.

## A. Sufficiency of the Evidence

Rivera, Hernández, and Ríos each challenge the sufficiency of the evidence presented at trial. Their respective challenges to specific elements of the carjacking offense are discussed below. Each appellant notes, correctly, that the conviction for using a firearm in a crime of violence -- the carjacking -- must be vacated if the predicate carjacking

conviction rests on insufficient evidence.  See United States v. Andujar, 49 F.3d 16, 22 (1st Cir. 1995) (finding § 924(c)(1) liability inapplicable where "crime of violence" element was not met due to insufficient evidence).  Like the appellants, we therefore focus on the sufficiency of evidence for the carjacking count.

## 1. Standard of Review

We review preserved sufficiency of evidence challenges de novo.[7]  United States v. Mendoza-Maisonet, 962 F.3d 1, 11 (1st Cir. 2020).  "[I]n so doing, 'we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime.'"  Díaz-Rosado, 857 F.3d at 120 (quoting United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008)).

---

[7]  General sufficiency challenges preserve all sufficiency-based arguments, but specific challenges waive all unspecified grounds. United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) (citing United States v. Peña-Lora, 225 F.3d 17, 26 n.5 (1st Cir. 2000)).  However, when a challenge is ambiguous, we view it as general. See id. at 134-35.  Therefore, to the extent that any of the Rule 29 motions may have been ambiguous because they referenced multiple specific arguments, we construe them as general challenges that preserved all sufficiency-based arguments. See id. at 134 (citing United States v. Hammoude, 51 F.3d 288, 291 (D.C. Cir. 1995)).

The court does "not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018). Accordingly, the court will "revers[e] only if the defendant shows that no rational factfinder could have found him guilty." United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019).

But "we must 'reject those evidentiary interpretations and [inferences] that are unreasonable, insupportable, or overly speculative.'" United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). Where, as here, a guilty verdict requires knowledge, the evidence must "support the inference that a defendant had knowledge of the crime." Id.; 18 U.S.C. § 2; Rosemond v. United States, 572 U.S. 65, 78 (2014) (explaining that 18 U.S.C. § 2 requires knowledge).

### 2. Liability for Aiding and Abetting a Carjacking

Appellants argue both that there was insufficient evidence to establish that a carjacking occurred and, additionally, that there was insufficient evidence to establish aiding and abetting liability.

A person may be liable for aiding and abetting a crime "if (and only if) [they] (1) take[] an affirmative act in furtherance of that offense, (2) with the intent of facilitating

- 14 -

the offense's commission."[8]  Rosemond, 572 U.S. at 71 (discussing 18 U.S.C. § 2).  As part of this intent requirement, the aider and abettor must "have knowledge of the full scope of the crime . . . 'at a time the accomplice can do something with it -- most notably, opt to walk away.'"  United States v. Encarnación-Ruiz, 787 F.3d 581, 588 (1st Cir. 2015) (quoting Rosemond, 572 U.S. at 78); see also United States v. Ford, 821 F.3d 63, 74 (1st Cir. 2016) ("[T]he government need prove beyond a reasonable doubt that the putative aider and abettor knew the facts that make the principal's conduct criminal.").

The government must also show that the underlying offense -- carjacking -- has actually been committed.  United States v. Rodríguez-Adorno, 695 F.3d 32, 42 (1st Cir. 2012).

### a. Carjacking

The evidence was sufficient for a rational jury to conclude that a carjacking occurred.

To impose criminal liability for a federal carjacking, the government must prove that the accused "with the intent to cause death or serious bodily harm takes [or attempts to take] a

---

[8] Although the appellants were charged as both principals and aiders and abettors, and it is unclear on which basis the jury convicted them, we do not address liability as a principal because it would not affect our analysis: we affirm on the easier-to-meet standards for aiding and abetting liability.  Moreover, the judgments for Rivera and Hernández note that they were convicted of aiding and abetting.

motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation." 18 U.S.C. § 2119. The carjacking statute's intent element encompasses the conditional intent to use violence if necessary to carry out the carjacking. Id.; Holloway v. United States, 526 U.S. 1, 3, 6-7 (1999) ("[T]he question is whether a person who points a gun at a driver, having decided to pull the trigger if the driver does not comply with a demand for the car keys, possesses the intent, at that moment, to seriously harm the driver."). We have previously found the requisite intent for carjacking where a defendant used violence before the car was taken and likely knew that his codefendant was armed. Rodríguez-Adorno, 695 F.3d at 42-43.

Appellants now make a variety of arguments challenging the evidence for the "presence of another," force, and intent elements.

The government presented sufficient evidence of the element requiring that the car be taken "from the person or presence of another." The associates had taken the car keys by force, physically harming Carmen, Antonio, and Luis Emilio in the process, and used those keys to steal the car. See United States v. García-Alvarez, 541 F.3d 8, 11-12, 16 (1st Cir. 2008) (holding that the "taking" of the car occurred when the owner was assaulted and forced to hand over his car keys). Additionally, Suárez

testified that Luis Emilio had been put in the Nissan and taken out again. Guzmán and Suárez then drove the Nissan away. As a whole, the evidence was sufficient to meet this element.

The government also presented sufficient evidence of the element requiring taking "by force and violence or by intimidation." Although Luis Emilio did not testify, there was enough testimony about the violence used by the assailants at the house for a rational jury to find that the car was taken at least "by intimidation," if not "by force and violence." The jury heard testimony that the associates were carrying firearms and had already stabbed and poured hot oil on Luis Emilio and Antonio. There was therefore sufficient evidence for the jury to find that Suárez and Guzmán took the car from Luis Emilio -- who had been stabbed by Guzmán and suffered heavy blood loss -- by intimidation or by force and violence.

Similarly, there was sufficient evidence for a rational jury to find that Guzmán and Suárez had the conditional intent to cause death or serious bodily harm if necessary to complete the carjacking.[9] See Holloway, 526 U.S. at 3, 7. Here, where Guzmán

---

[9] Rivera and Hernández focus on Holloway's language that the accused must have the requisite intent "at [the] moment" he demands the car. See Holloway v. United States, 526 U.S. 1, 7 (1999). Rivera and Hernández argue that the violence of the immediately preceding home invasion does not necessarily mean that Suárez and Guzmán had the intent to cause death or serious bodily harm at the moment they took the car. This focus is misplaced because, as Rodríguez-Adorno demonstrates, violence used before the "moment"

himself had already stabbed Luis Emilio, the associates as a group had seriously injured the family members, and everyone carried guns, the jury could infer that Suárez and Guzmán would use violence again to take the car if necessary. See Rodríguez-Adorno, 695 F.3d at 42-43 (finding the requisite intent where the violence used "suggest[ed] a willingness to harm the victim").

Therefore, the government presented sufficient evidence for a rational jury to conclude that each of the carjacking elements had been met, with Suárez and Guzmán acting as the principals.

### b. Aiding and Abetting Liability

The appellants' challenges to the evidence for aiding and abetting liability require a closer look. However, we ultimately conclude that the government presented sufficient evidence to support the jury's finding that each appellant aided and abetted the carjacking.

The government was required to prove that (1) each appellant took an affirmative act in furtherance of the carjacking with (2) the intent to facilitate the carjacking. See Rosemond, 572 U.S. at 71. To satisfy the intent element, the government also had to prove that Rivera, Hernández, and Ríos had knowledge

---

the car is demanded can properly be considered in determining conditional intent. United States v. Rodríguez-Adorno, 695 F.3d 32, 42-43 (1st Cir. 2012).

- 18 -

of the carjacking at a time when they could have walked away. See id. at 78, 82-83 (finding that to impose aiding and abetting liability for using a gun in connection with a drug trafficking crime, the government must show petitioner knew his codefendant was armed before petitioner actively participated in the drug trafficking crime); Ford, 821 F.3d at 74-75 (affirming aiding and abetting liability for a firearms offense due to sufficient circumstantial evidence that defendant knew her husband had previously been convicted of a felony).

We take each appellant in turn.

### i. Ríos

The government presented sufficient evidence of Ríos's knowledge because FBI Agent Gonzalez testified that Ríos saw Guzmán and Suárez leave the house in the Nissan to head to an ATM. Having heard this testimony, the jury could infer that Ríos had knowledge of each of the elements of carjacking because he knew the Nissan was not the associates' car and he knew of the force that had already been used against the family. The jury therefore could infer that Ríos knew that his associates took the car by intimidation from the family members with the conditional intent to use violence if necessary to carry out the carjacking. See Holloway, 526 U.S. at 4 (finding conditional intent for carjackings where an accomplice had a gun and would have used it "if any of the drivers had given him a 'hard time'").

There was also sufficient evidence for a rational jury to find that Ríos took an affirmative act to further the carjacking with the intent to facilitate the carjacking. See Rosemond, 572 U.S. at 71. Ríos, along with Rivera, Hernández, and Correa, remained behind with the three family members. The four of them stayed until Guzmán and Suárez arrived at the ATM and Correa gave them the family's PIN codes over the phone. Then, after tying Carmen up, they left the house. See United States v. Figueroa-Cartagena, 612 F.3d 69, 75 (1st Cir. 2010) (holding that a carjacking continues while the carjacker maintains control over the victim and the car).

Because there was evidence of Ríos's knowledge of the carjacking, there was also sufficient evidence of his intent to facilitate the carjacking. In addition to testifying about Ríos seeing the Nissan leave, Agent Gonzalez testified that Ríos admitted that Correa gave the PIN codes over the phone "in order . . . to facilitate" getting money from the ATM. From Agent Gonzalez's testimony, a rational jury could infer that Ríos knew that Correa was coordinating with Suárez and Guzmán. A jury could infer that Ríos remained with the family members, helped tie up Carmen, and left after Correa gave the PIN codes with the intent of facilitating the carjacking: to prevent the victims from getting help and stopping the car theft. See id. at 75 (holding that

defendant facilitated the carjacking by helping to guard the victim at her family's house and fending off neighbors).

Ríos argues that he left before the Nissan returned and therefore could not be found guilty of aiding and abetting the carjacking. This is unpersuasive. What matters is that Ríos knew of the carjacking at a time where he could walk away but did not do so. Encarnación-Ruiz, 787 F.3d at 588. Instead, a rational jury could infer that he stayed to prevent the family members from seeking help until the carjackers had successfully withdrawn money from the ATM. This qualifies as aiding and abetting the carjacking.

### ii. Hernández

Although Hernández purports to challenge the sufficiency of the evidence as to his knowledge, he has failed to develop it in his opening brief and, accordingly, has waived the issue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (issues mentioned perfunctorily without any effort at developing the argument are waived). Hernández briefly mentioned -- without any citation -- the requirement that the alleged aider and abettor must know of the crime at a time that they could walk away. But he did not allege that he lacked knowledge, instead arguing that a carjacking did not occur. By "mention[ing] a possible argument in the most skeletal way, leaving the court to do counsel's work,"

Hernández waived the argument that he did not have sufficient knowledge of the carjacking.[10]  Id.

As Hernández does not challenge the knowledge element, much of the same testimony that demonstrated Ríos's acts and intent to further the carjacking also provided a sufficient basis for the jury to find that Hernández, too, met the intent and affirmative act requirements.  Like Ríos, he stayed behind to guard Carmen, Antonio, and Luis Emilio.  Guarding the family members to prevent them from calling for help or escaping aided Guzmán and Suárez, who had taken the Nissan to the ATM.  The purpose of the home invasion that day was to take anything of value, and the ATM cards had to be brought to an ATM in order to withdraw money.  Hernández left the family members he was guarding only after Correa had provided the PIN codes to Guzmán and after all three family members were tied up.  A rational jury could infer that Rivera, Hernández, Ríos, and Correa were in communication with Suárez and Guzmán.  A jury could therefore conclude that Hernández had taken these actions with the intent of facilitating the carjacking and that these actions did, in fact, further the carjacking.  See Rosemond, 572 U.S. at 71.

---

[10] Hernández did develop this argument somewhat more in his reply brief, although he erroneously argued that he had to know that a carjacking was "going to be committed" at the time the home invasion began.  But arguments advanced for the first time in a reply brief are waived.  United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008).

- 22 -

### iii. Rivera

As with Ríos, the government presented sufficient evidence that Rivera took an affirmative act in furtherance of the carjacking. See id. Like Ríos and Hernández, Rivera helped to guard the three family members and left only after the PIN codes had been provided, the cash had been withdrawn, and Carmen had been tied up.

However, the question of Rivera's knowledge, which is required for the intent element, is more difficult to resolve than Ríos's knowledge. Agent Gonzalez's testimony provided direct evidence that Ríos knew the car had been taken, but the government did not provide any specific evidence of Rivera's own knowledge. The testimony was often general, using "they" to describe what happened rather than specifying who took which actions. While this is a close call, we ultimately conclude that the government presented sufficient evidence of Rivera's knowledge.

To begin, we note that the government has not cited any case in which a defendant was held liable for a carjacking as an aider and abettor without direct evidence of the defendant's own knowledge that a carjacking occurred. When pressed on this point at argument, the government cited García-Alvarez. 541 F.3d 8. In that case, the appellant and three codefendants assaulted a man in the parking lot of his apartment building, tied him up, and stole the keys to his house and car. Id. at 11-12. One codefendant (it

is not specified which) held a gun to the man's head while the other three robbed his home.  Id. at 12.  Then all four left in the man's car.  Id. at 12.  The court held that there was sufficient evidence of the appellant's intent because the appellant was "present and active" in assaulting the man and taking his car keys -- which was when the "taking" of the car occurred -- and he left the scene in the stolen car.  Id. at 16.  Because the appellant left in the stolen car, he clearly knew the car had been taken.  Id. ("Based on this evidence, [the appellant] could not but be aware that he was involved in the taking of a motor vehicle, and the intent requirement . . . is resoundingly met.").  In this case, however, there is not such clear evidence that Rivera knew that the Nissan had been taken.

In its brief, the government also cited Figueroa-Cartagena, where a defendant was held liable for aiding and abetting a carjacking despite becoming involved hours after the car had been taken.  612 F.3d at 75.  In that case, the carjackers arrived at the appellant's family home in the stolen car.  Id. at 72.  The appellant helped to coordinate the efforts to guard the car's owner while the carjackers withdrew money using the owner's ATM card, and the appellant herself helped to subdue the owner when he tried to escape from the car.  Id.  The appellant also warded off nosy neighbors who heard the noise.  Id.  There, the appellant's liability hinged on the fact that the owner was

still being held hostage in the car when she got involved. Id. at 75. But, as with García-Alvarez, the evidence of the specific defendant's knowledge for aiding and abetting liability was clearer than in this case: she helped to subdue the victim after he escaped from his carjacked car, thereby demonstrating her knowledge that a car had been stolen. Id. at 72.

Despite the government's inability to identify an on-point case, in the present set of circumstances, a rational jury could have inferred Rivera's knowledge from the inference that he was present for a discussion about abducting Luis Emilio in the Nissan; the evidence that the entire group remained in communication after Suárez and Guzmán drove away; and the overall length of time that elapsed from the start of the incident to its end.

First, the jury could infer that Rivera was personally guarding Carmen throughout the incident. Carmen identified Rivera as the unmasked man who made her run from the yard into the house: "He was the one that grabbed and controlled me during the whole time, who made me run." She also testified that a skinny unmasked man in shorts "was always guarding [her]." The jury could have reasonably inferred that he was the same unmasked man in both portions of her testimony and that he had guarded her throughout.

Second, the jury could also infer that Carmen -- and therefore Rivera -- overheard a discussion about taking Luis

Emilio in the family's Nissan to the ATM. The evidence indicated that Carmen was present in the living room when Luis Emilio was stabbed in the thigh. Suárez testified that he immediately tried to apply a tourniquet to Luis Emilio's leg, and then the associates began discussing a plan to take Luis Emilio to the Nissan and bring him to the closest ATM. Antonio's testimony confirmed that Carmen was part of this discussion, pleading with the associates to go withdraw money from an ATM and let the family go. Because Rivera was next to Carmen the whole time, the jury could infer that he heard the discussion and was aware of the plan to kidnap Luis Emilio in the family's car. The jury also could have concluded that Suárez and Guzmán abandoned the plan to kidnap Luis Emilio after they had brought him downstairs, out of the earshot of Carmen and Rivera.

Third, the remaining evidence bolstered the inference that Rivera knew that the Nissan had been taken. The evidence showed that even after leaving with the ATM cards, Suárez and Guzmán were in contact with the appellants and Correa at the house. Once Suárez and Guzmán arrived at the gas station, Correa called them with the family's PIN codes. Then Correa and the appellants left the house in the same narrow window of time when Suárez and Guzmán were driving back from the ATM. Since Rivera and the three associates left only after Guzmán had received the ATM PIN codes and withdrawn cash, the jury could infer that Rivera and the others

were in communication with the carjackers and left only after they ensured the success of the ATM withdrawal.

Finally, Carmen testified that the entire ordeal lasted three hours or more. The length of the incident, along with Carmen's testimony that the group was "incredibly organized," makes it less likely that Rivera was unaware of what his associates were doing. In addition, the jury saw photographs of the two-story house, which had a garage on the first floor and windows on both floors overlooking the driveway. The photographs showed two external staircases and one internal staircase to the garage. While the testimony sometimes lacked specificity as to who did which act, the jury heard that Rivera and three associates remained behind with the three victims and tied all of them up before leaving. The size of the house, the length of the incident, and the more than one-to-one ratio of guards to family members buttressed the jury's reasonable conclusion that Rivera knew that Guzmán and Suárez had acted on their plan to steal the family's car.

In affirming, we note that the evidence supports "the inference that [the accused] had knowledge of the crime." Rodríguez-Martinez, 778 F.3d at 371. Evidence of knowledge for aiding and abetting liability cannot rest on "mere speculation" or "mere presence." Id. at 372-73. But the evidence here does not support "an equal or nearly equal theory of guilt and a theory of

innocence." <u>See</u> <u>id.</u> at 373 (quoting <u>United States</u> v. <u>Woodward</u>, 149 F.3d 46, 57 (1st Cir. 1998)). While the government would have been wise to elicit more specific testimony about each appellant, there was enough circumstantial evidence for the jury to make the inferences above and find beyond a reasonable doubt that Rivera knew of the carjacking at a time when he was able to leave and failed to do so.

Because there was sufficient evidence of Rivera's knowledge, there was also sufficient evidence of his intent. As with Ríos and Hernández, the jury could infer that Rivera's actions (staying behind to guard the family members and leaving only after the PIN codes had been given and all three family members were tied up) were taken with the intent to facilitate the carjacking.

We thus find sufficient evidence supported the jury's guilty verdicts for Rivera, Hernández, and Ríos for both carjacking and using a firearm in a crime of violence.

## B. Denial of Motion to Dismiss for Delayed <u>Brady</u> Disclosures

Rivera appeals two decisions stemming from the government's delayed disclosure of exculpatory evidence: the denial of his motion to dismiss the indictment and the denial of his motion for severance from Ríos. We describe the pretrial procedural history before discussing each in turn.

## 1. Additional Procedural Background

The court set a trial date of May 23, 2022, nearly six years after Ríos's arrest and almost seven years after Rivera and Hernández were arrested.

On May 18, 2022, the government disclosed FBI lab reports with fingerprint analysis and an FBI agent's notes from an interview with a codefendant, Reynaldo Meléndez-López, that had taken place on May 13, 2016.[11]  The translated notes stated that Meléndez-López said, "[Hernández] was not in the house neither [Rivera].  I don't know them, but I have seen him in the news."

On May 23, 2022, the government disclosed additional discovery consisting of four video recordings of codefendants' interviews from when they were arrested in 2015 and 2016.  Two recorded interviews -- one with Meléndez-López and one with Ríos -- contained exculpatory evidence for Rivera and Hernández.  The government produced transcripts and translations of these videos on May 31, 2022, after the court ordered it to do so.  On May 30, 2022, the government disclosed the transcript of the September 14, 2016 grand jury minutes for the superseding indictment.

Rivera and Hernández jointly moved to dismiss the indictment due to alleged Brady violations and prosecutorial

---

[11] Reynaldo Meléndez-López was indicted with the other six codefendants and pled guilty but was never mentioned at trial.

misconduct. They argued that their ability to investigate and prepare was hindered because witnesses' recollections would not be as fresh seven years after the incident. But they did not provide any case law supporting that the remedy should be dismissal of the indictment. Ríos also moved to dismiss the indictment, arguing that the evidence was insufficient to support a determination of probable cause.

On May 31, 2022, the court held a full-day hearing on the various motions resulting from the government's disclosures. The court stated that the evidence containing exculpatory statements was at least arguably Brady material and that it was concerned about the late disclosure. It invited further briefing on the remedy for delayed Brady disclosures and asked the defense for caselaw supporting its position that the remedy should be dismissal with prejudice. The court also postponed trial to June 27, 2022, to allow time for ruling on the motions.

Rivera and Hernández then submitted a memo arguing that the court could dismiss criminal charges as a sanction for outrageous governmental misconduct. They argued that the prosecution's seven-year delay in disclosing exculpatory evidence constituted "outrageous governmental misconduct" and warranted dismissal. In response, the government argued that Rivera and Hernández had not shown prejudice under Brady because they still had "weeks" to make use of the evidence. The government also

argued that the case law cited by the defendants did not support their request for dismissal.  The court denied the motions to dismiss the indictment.

### 2. Standard of Review

We review the district court's Brady rulings for abuse of discretion.  United States v. Ramundí-Hernández, 984 F.3d 127, 159 (1st Cir. 2020).

### 3. Analysis

Delayed disclosures of exculpatory evidence may warrant relief where the delay prejudiced the defendant.  United States v. Montoya, 844 F.3d 63, 71 (1st Cir. 2016).  The appellant "must show 'a reasonable probability that the outcome of his case would have been . . . different' had the material been disclosed in a timely manner."  Id. (alteration in original) (quoting United States v. Delgado-Marrero, 744 F.3d 167, 199 (1st Cir. 2014)); see also United States v. Osorio, 929 F.2d 753, 757 (1st Cir. 1991) ("[A] court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990))).  The defense also must show a "plausible strategic option which the delay foreclosed."  Montoya, 844 F.3d at 72 (quoting Delgado-Marrero, 744 F.3d at 200); see id. ("[T]he defendant's vague suggestion that his 'defense theory might have

had an entirely different cast' . . . is wholly speculative."). If defense counsel fails to ask for a continuance, this court generally sees such a failure as a waiver of any claim of prejudice. Osorio, 929 F.2d at 758; see also United States v. Smith, 292 F.3d 90, 102-03 (1st Cir. 2002) (likely waiver where court granted continuance and defense counsel did not request any additional continuances).

To be clear, we see no reason justifying the government's disclosure of Brady material on the eve of trial, after Rivera and Hernández had been in pretrial detention for nearly seven years. At argument, the government explained that the trial prosecutors were "not sure" what had been produced in discovery, due to attorney turnover, so they re-produced some discovery and produced -- for the first time -- other discovery that had "fallen through the cracks." This explanation is wholly inadequate. See Osorio, 929 F.2d at 760-62 (explaining the United States Attorney's Office's constitutionally derived responsibility to provide Brady material).

But Rivera did not request any additional continuances after the court granted a roughly one-month continuance. See Smith, 292 F.3d at 102-03; see also United States v. De La Cruz-Feliciano, 786 F.3d 78, 87-88 (1st Cir. 2015) (no prejudice where defense counsel had seven days, between start and end of trial, to use Brady evidence). Even if Rivera's challenge were

preserved, he has not demonstrated prejudice because he does not identify any particular strategy that was foreclosed. See Smith, 292 F.3d at 102-03; Montoya, 844 F.3d at 71-72 (no new trial warranted where defense counsel was able to effectively use Brady material disclosed on the third day of trial). Indeed, Rivera's defense made use of the reports showing that his fingerprints were not found on the scene, and the three appellants used Suárez's interview to impeach him on cross-examination. Rivera's inability to call Meléndez-López at trial was due to Meléndez-López's Fifth Amendment privilege against self-incrimination, not due to delayed disclosure. And his inability to call Ríos at trial was due to the court's decision not to sever the joint trial, discussed below, and Ríos's own Fifth Amendment privilege.

Moreover, Rivera requests the "extraordinary" remedy of dismissal of the indictment. Osorio, 929 F.2d at 762-63. The district court has the power to provide such a remedy "[w]hen confronted with extreme misconduct and prejudice as a result of delayed disclosure." Id. at 763. Such a remedy might be warranted if the United States Attorney's Office demonstrated "a consistent pattern and practice of negligent nondisclosure, resulting in actual prejudice to defendants." Id. But supervisory powers "must be used sparingly," and this case does not rise to that level. Id. (no new trial warranted where "[t]he government's misconduct has not been characterized as anything other than negligence,

albeit 'astounding'"); see also United States v. Hasting, 461 U.S. 499, 504-06 (1983) (holding that a court cannot exercise its supervisory powers to reverse a criminal conviction if the government's error is harmless).

Therefore, the court did not abuse its discretion in denying the motion to dismiss the indictment.

### C. Denial of Severance

### 1. Additional Procedural Background

The government's delayed disclosure included Ríos's May 16, 2016 interview with FBI agents, including Agent Gonzalez. This interview included statements exculpating Rivera and Hernández and inculpating Ríos.[12] The court granted Ríos's motion to suppress this interview because the government had violated his Miranda rights. Because this suppressed interview contained statements exculpating them, Rivera and Hernández sought severance in order to call Ríos as a defense witness. The court denied the motion to sever.

---

[12] The parties have not provided the precise statements that Ríos made in the videotaped interview. But FBI Agent Gonzalez testified to the grand jury that Ríos "stated to the FBI that [Rivera and Hernández] were not present at the residence." Because the government does not contest Rivera's assessment of the statements as exculpatory, we accept Rivera's assessment that the statements exculpated him.

## 2. Standard of Review

This court reviews a district court's denial of a motion for severance for manifest abuse of discretion. United States v. DeCologero, 530 F.3d 36, 52 (1st Cir. 2008). This standard reflects trial judges' "first-hand exposure to a case" that better allows them to "strike the delicate balance between fending off prejudice, on the one hand, and husbanding judicial resources, on the other hand." Id. (quoting United States v. O'Bryant, 998 F.2d 21, 25-26 (1st Cir. 1993)). To prevail on a challenge to the court's denial of severance, the appellant must make a "strong showing [that] prejudice" resulted from the denial of severance. United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) (quoting United States v. Porter, 764 F.2d 1, 12 (1st Cir. 1985)). We have warned that "[t]his is a difficult battle for a defendant to win." Id. "In this context, 'prejudice means more than just a better chance of acquittal at a separate trial.'" Id. (quoting United States v. Martinez, 479 F.2d 824, 828 (1st Cir. 1973)).

## 3. Analysis

Rule 14 of the Federal Rules of Criminal Procedure allows a court to sever defendants' trials where joinder may prejudice a defendant. Fed. R. Crim. P. 14(a). The district court should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants,

or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

In Zafiro, the Supreme Court listed potential scenarios where this risk might occur and severance might be warranted. Id. That list included -- as relevant here -- if evidence admissible only against a codefendant is admitted or "if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id. But the Zafiro Court noted that severance may not always be required in such situations, because some types of prejudice may be cured with limiting instructions, which juries are presumed to follow. Id. at 540-41 (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

On appeal, Rivera argues that the court's denial of severance from Ríos prejudiced him in two ways. First, Rivera was precluded from calling Ríos to testify about the interview with the FBI, which contained statements exculpating Rivera, because the court had suppressed this interview for Ríos. Second, Rivera argues that more evidence was introduced against Ríos than against Rivera, resulting in undue "spillover" prejudice. We take each in turn.

### a. Severance due to Exculpatory Evidence

A defendant who seeks severance based on the need for a codefendant's exculpatory testimony must show "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its

exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed." United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984) (quoting United States v. Butler, 611 F.2d 1066, 1071 (5th Cir. 1980)). Even once this initial showing has been made, the court should "(1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion." Id.; see also United States v. Catalan-Roman, 585 F.3d 453, 461-62 (1st Cir. 2009) (applying Drougas).

We assume without deciding that the first three preliminary factors are met. Although the record does not contain the statements in Ríos's interview, he is described as telling the FBI that Rivera and Hernández were not present at the house, which would be strongly exculpatory and critical to Rivera's defense. The government has not contested Rivera's assessment of the statements as exculpatory. We may assume that these factors are met because we conclude that Rivera did not make the showing required for the fourth factor.

Rivera must show that Ríos would, in fact, testify. See Drougas, 748 F.2d at 19. In Rivera's motion to sever, he did not say that Ríos would testify. His motion stated that Rivera's

attorney had informed Ríos's attorney of Rivera's intention to call Ríos as a defense witness.[13]  But Rivera did not include any representations of Ríos's intentions, either from Ríos or his attorney.  See United States v. Nason, 9 F.3d 155, 158-59 (1st Cir. 1993) (severance properly denied where codefendant's counsel did not represent that codefendant would testify, nor did defendant file affidavit from codefendant to that effect); Drougas, 748 F.2d at 19 (severance properly denied where the timing of codefendants' affidavits saying they would testify -- offered seventy-two days into trial and after the conclusion of government's case-in-chief -- "casts doubts upon the [affidavits'] bona fides").  Therefore, the court did not abuse its discretion in denying the motion to sever.[14]

---

[13] Although Rivera did not make this argument in his motion to sever or in his appellate brief, the parties discussed at oral argument whether the court should have proceeded with Ríos's trial and sentencing first so that Rivera could subpoena Ríos as a witness after Ríos had lost his Fifth Amendment right against self-incrimination.  This argument is waived and unpreserved. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  In any event, this court has expressed doubt -- without deciding -- that an offer to testify conditioned on the order of the separate trials would meet Drougas's requirements.  See United States v. Smith, 46 F.3d 1223, 1231 n.3 (1st Cir. 1995).

[14] Since Rivera did not make the initial showing required under Drougas, we need not consider Drougas's second-tier criteria.  See United States v. Nason, 9 F.3d 155, 159 (1st Cir. 1993).

## b. Severance due to "Spillover" Prejudice

The prejudice from joint trials may include "spillover effects where the crimes of some defendants are more horrific or better documented than the crimes of others." United States v. Martínez, 994 F.3d 1, 15-16 (1st Cir. 2021) (internal quotation marks omitted) (quoting United States v. Innamorati, 996 F.2d 456, 469 (1st Cir. 1993)).

Rivera argues he was prejudiced because the government presented additional evidence of Ríos's guilt: testimony about Ríos's first interview with the FBI, in which Ríos incriminated himself, would not have been admitted in a separate trial. Rivera acknowledges that the court instructed the jury to consider testimony about the interview only with regards to Ríos, not Rivera or Hernández, but argues that this instruction was insufficient.

But Rivera cannot make a strong showing of prejudice that is more than just better odds of acquittal. See Boylan, 898 F.2d at 246. During this nine-day trial, FBI Agent Gonzalez testified for only a few minutes, recorded in three pages of the transcript, about Ríos's statements in the interview. Ríos told Agent Gonzalez that the group had used three vehicles to get to the family's house, that everyone was armed, that he had seen Guzmán and Suárez leave in the Nissan, and that Correa gave the PIN code over the phone to Guzmán and Suárez. He also named several participants in the home invasion, but not Rivera or

- 39 -

Hernández.  But most of this testimony was cumulative of Suárez's and the family members' testimony.  Moreover, any new facts were not prejudicial to Rivera.

Here, where little additional evidence was introduced against Ríos, Rivera and Ríos were accused of the same crimes, and the judge gave appropriate limiting instructions, we cannot say that the court abused its discretion in denying severance due to the risk of spillover prejudice.  See United States v. Tiem Trinh, 665 F.3d 1, 19-20 (1st Cir. 2011) (no abuse of discretion where the factors weighing against prejudice included that the majority of evidence was admissible against all codefendants and that the court gave appropriate limiting instructions); cf. Martínez, 994 F.3d at 14-16 (abuse of discretion to deny severance where a considerable amount of evidence would not have been admissible against appellant alone and where limiting instructions were insufficient to mitigate the risk of spillover prejudice).

### D. Confrontation Clause

On appeal, Rivera argues the Confrontation Clause was violated on four specific instances when Carmen and Antonio testified about Luis Emilio, who did not himself testify.  We reject each claim.

### 1. Standard of Review

Preserved Confrontation Clause claims are reviewed de novo. United States v. Pérez-Vásquez, 6 F.4th 180, 197 (1st Cir. 2021).

### 2. Analysis

For all four of these alleged Confrontation Clause violations, Rivera objected at trial to Carmen and Antonio testifying about the experiences of Luis Emilio, who did not testify.[15] The first statement at issue concerns Carmen's testimony that Luis Emilio had seen the armed associates grab Carmen and Antonio; the second statement concerns her testimony that the associates refused Luis Emilio's request to help him tie off his stabbing wound. Third, Rivera challenges Carmen's testimony about an exhibit, in which she stated that Luis Emilio had been forced to sit in the chair depicted and that his blood was on the floor. The fourth alleged violation is similar: Antonio looked at two exhibits depicting injuries and identified Luis Emilio's face and legs.

---

[15] Rivera challenges an additional four statements. But at trial, he failed to object at all to these instances. Unpreserved claims, including where the defense failed to contemporaneously object, receive plain-error review. United States v. Acevedo-Maldonado, 696 F.3d 150, 155-56 (1st Cir. 2012). However, as Rivera did not argue plain-error review on appeal, he has waived review of these claims. See United States v. Pabon, 819 F.3d 26, 33-34 (1st Cir. 2016) (failure to cite four-factor plain-error test or attempt to establish its factors constitutes waiver).

For the second and third statements, Rivera did not specify that he objected on the basis of the Confrontation Clause. But we assume, favorably to Rivera, that he preserved these claims for our review. See United States v. Ramos-González, 664 F.3d 1, 3-4 (1st Cir. 2011) (finding that it was clear from context that counsel was objecting on confrontation grounds). His challenges fail regardless.

The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Crawford held that the Confrontation Clause prohibits the "admission of testimonial hearsay in a criminal case unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination." United States v. Earle, 488 F.3d 537, 542 (1st Cir. 2007) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)). Therefore, in reviewing a Crawford claim, we "consider two threshold issues: (1) whether the out-of-court statement was hearsay, and (2) whether the out-of-court statement was testimonial." Id. (citing Crawford, 541 U.S. at 68).

But Rivera bases his argument on outdated case law, asserting that "[t]he right to confrontation governs non-testimonial hearsay statements as well as testimonial hearsay statements." This argument is firmly foreclosed by precedent from this court and the Supreme Court. See id. ("[T]he Confrontation

Clause applies only to testimonial hearsay." (citing Davis v. Washington, 547 U.S. 813, 823-24 (2006))).  Because Rivera has not presented any argument that these statements were testimonial, he has waived our review of the merits by "leaving [this] court to do counsel's work."  Zannino, 895 F.2d at 17.

We therefore find no violations of the Confrontation Clause at trial.

### E. Sentencing

Finally, Rivera and Hernández both challenge their sentences.

### 1. Standard of Review

We ordinarily review preserved claims of sentencing error for abuse of discretion.  United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016).  Within the abuse-of-discretion framework, we review legal interpretations and applications of the sentencing guidelines de novo.  United States v. Whooten, 279 F.3d 58, 60 (1st Cir. 2002).

We typically start with claims of procedural error. Montero-Montero, 817 F.3d at 37; see also United States v. Melendez-Hiraldo, 82 F.4th 48, 53 (1st Cir. 2023).  These errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the

chosen sentence -- including an explanation for any deviation from the Guidelines range." Gall v. United States, 552 U.S. 38, 51 (2007). The court's burden to adequately explain its sentence is "lightened" where the sentence falls within the applicable guideline sentencing range. Montero-Montero, 817 F.3d at 37.

If we find that the sentence is procedurally sound, we then review the substantive reasonableness of the sentence for abuse of discretion. Gall, 552 U.S. at 51. "A sentence is substantively reasonable if it 'reflects a plausible sentencing rationale and a defensible result.'" Melendez-Hiraldo, 82 F.4th at 53 (quoting United States v. Rossignol, 780 F.3d 475, 477 (1st Cir. 2015)). This review "is limited to determining whether [the district court's] sentence, in light of the totality of the circumstances, resides within the expansive universe of reasonable sentences." Id. (alteration in original) (quoting Rossignol, 780 F.3d at 477).

However, we review for plain error when a defendant fails to preserve a claim of procedural or substantive error below. Id. (citing Montero-Montero, 817 F.3d at 37). "To succeed under plain[-]error review, an appellant must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" Montero-Montero, 817 F.3d

at 37 (alteration in original) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

## 2. Rivera's Sentence

Rivera challenges his sentence as procedurally unreasonable because the court should not have applied the abduction or serious bodily injury enhancements and because his criminal history category should have been lower.

At Rivera's sentencing, the court applied three enhancements. First, the court applied a four-level enhancement because a victim sustained a serious bodily injury. See U.S.S.G. § 2B3.1(b)(3)(B). Second, the government argued for the abduction enhancement because the codefendants had taken Luis Emilio from the second floor to the car. See U.S.S.G. § 2B3.1(b)(4)(A). The court agreed and applied this four-level enhancement because "[t]he defendant[s] attacked a two-story structure leading to a carjacking. It was predictable, what happened." Third, the court applied a two-level enhancement because the offense involved a carjacking. See U.S.S.G. § 2B3.1(b)(5).

The court noted that Rivera received three criminal history points for a separate federal case for which he had been sentenced earlier in the same proceeding and received a concurrent sentence of 51 months' incarceration. The court stated that the relevant guideline range for the carjacking count was 108 to 121 months and that the firearm count required a minimum sentence of

72 months. The court sentenced Rivera at the bottom of the relevant range: 108 months on the first count to be served consecutively to 72 months on the second count, for an aggregate term of 180 months' incarceration and five years' supervised release.

As relevant to this appeal, Rivera's counsel submitted a sentencing memorandum objecting to several portions of the Presentence Investigation Report ("PSR"). He argued that the serious bodily injury enhancement should not apply because the victims' injuries did not qualify as "serious" and he himself did not cause any injuries. He argued that the abduction enhancement should not apply because no one was abducted. He also challenged the PSR's statement that his criminal history points would increase on the day of sentencing after he was sentenced in another federal case.

At the sentencing hearing, Rivera reiterated his objections from his sentencing memorandum to the serious bodily injury and abduction enhancements. He elaborated on the abduction argument, saying that the enhancement should not apply without evidence that Rivera participated in the abduction or knew it was going to happen. But he did not mention the criminal history issue or object when the court applied the criminal history points.

We discuss each of Rivera's challenges in turn.

### a. Serious Bodily Injury Enhancement

First, Rivera argues that the court should not have applied a four-level enhancement for a victim sustaining a serious bodily injury. See U.S.S.G. § 2B3.1(b)(3)(B). Rivera argues that the injuries here were not "serious" and that he himself did not cause these unforeseeable injuries. Because Rivera objected below, we review for abuse of discretion. Both arguments fail.

"Serious bodily injury" encompasses "injury involving extreme physical pain . . . or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(M). Courts may consider the nature of a hospital stay in determining whether this enhancement is warranted. See United States v. Slow Bear, 943 F.2d 836, 837-38 (8th Cir. 1991) (finding an almost-identical Guidelines definition of "serious bodily injury" met where skull fracture resulted in hospitalization); United States v. Johnson-Dix, 54 F.3d 1295, 1312-13 (7th Cir. 1995) (same, where gunshot wound resulted in a broken leg and a two-day hospital stay); cf. United States v. Dortch, 628 F.3d 923, 925-26 (7th Cir. 2010) (doubting that hospitalization for precautionary observation, rather than actual injury, would constitute "serious bodily injury," but finding any error harmless).

The evidence at trial showed that Luis Emilio and Antonio each had hot oil poured on them and Luis Emilio was stabbed in the

- 47 -

thigh and was left "bleeding out." Antonio testified that both he and his brother were "screaming" from the pain. Antonio then "got dizzy" and "stopped feeling anything" from the shock. Luis Emilio was in the hospital for one or two days and both brothers underwent over a month of treatment for their burns.

The court did not abuse its discretion in finding that a victim had suffered a serious bodily injury, given Luis Emilio's hospitalization and blood loss, both brothers' ensuing rehabilitative treatment, and Antonio's testimony about the excruciating pain that both brothers experienced. See United States v. Moore, 997 F.2d 30, 37 (5th Cir. 1993) (no abuse of discretion to apply enhancement where victim was shot and treated during a two-hour emergency room visit, was not hospitalized, and had to take time off from work afterwards); see also United States v. Desormeaux, 4 F.3d 628, 630 (8th Cir. 1993) (clear error to not apply enhancement where victim was stabbed, resulting in a lacerated kidney, blood loss, excruciating pain, and a four-day hospital stay); Sustache-Rivera v. United States, 221 F.3d 8, 18-19 (1st Cir. 2000) (collecting cases where the guideline definition of "serious bodily injury" was met).

The court also did not abuse its discretion in applying this enhancement to Rivera's guideline calculation. The guidelines state that specific offense characteristics -- which include the serious bodily injury enhancement -- should be

- 48 -

determined on the basis of "all acts and omissions committed, aided, [or] abetted . . . by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). Here, Rivera "aided [or] abetted" the acts that caused serious bodily injury. See id. Because this provision alone supports the application of the sentencing enhancement, we need not address Rivera's contention that the injuries were not foreseeable. See U.S.S.G. § 1B1.3(a)(1)(B)(iii).

### b. Abduction Enhancement

Second, Rivera argues that the court abused its discretion in applying a four-level abduction enhancement because a person "was abducted to facilitate commission of the offense." U.S.S.G. § 2B3.1(b)(4)(A). Rivera again makes two arguments on appeal: first, that no one was abducted, and second, that he cannot be responsible for any abduction. Because Rivera objected below, we review for abuse of discretion.

The Guidelines define "abducted" as meaning "that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, cmt. n.1(A); id. § 2B3.1, cmt. n.1 (this definition of "abducted" should be used in applying the abduction enhancement); see also Whooten, 279 F.3d at 60-61 (abduction to a "different location" where appellant forced victim at gunpoint outside of a

- 49 -

store and 65 feet into a parking lot, which was still 90 feet away from appellant's getaway car).

The trial testimony included that the codefendants took Luis Emilio downstairs as part of their decision to take ATM cards and drive to a nearby gas station. Carmen testified that Luis Emilio was held "at gunpoint." Suárez testified that his codefendants put Luis Emilio in the Nissan and that Suárez took him out. Carmen testified that the Nissan was at the entrance to the property. From these two witnesses, it therefore seems clear that Luis Emilio was taken at gunpoint from the second floor downstairs and across the yard to the Nissan at the entrance to the property. In these circumstances, the district court did not abuse its discretion in finding that Luis Emilio was abducted to facilitate the carjacking.

Furthermore, Rivera was properly held responsible for his codefendants' actions, even if he himself did not participate. Rivera challenges the application of U.S.S.G. § 1B1.3(a)(1)(B) because any abduction was not foreseeable. But, given our affirmance of Rivera's conviction for aiding and abetting a carjacking, we agree with the district court that it was foreseeable that executing a planned armed robbery on an occupied family home could result in an abduction like the one described here.

### c. Criminal History Category

Finally, Rivera contends that the sentencing court erroneously assessed three criminal history points for a sentence he received on the same date and during the same proceeding as this case.  See U.S.S.G. § 4A.1.2(a)(1).

Because Rivera did not object on this basis at sentencing, we review this claim of procedural error for plain error.  See Montero-Montero, 817 F.3d at 37.  In his sentencing memorandum, Rivera challenged the PSR's statement that his criminal history points would change on the day of sentencing: "this assertion is irrelevant for purposes of sentencing in this case, precisely because he will be sentenced jointly for the [two] cases."  However, he failed to object to the alleged error when it occurred at the sentencing hearing.  See United States v. Ortíz-Mercado, 919 F.3d 686, 689 (1st Cir. 2019) (reviewing for plain error where the appellant made an argument in his sentencing memorandum but failed to object at sentencing (citing Puckett v. United States, 556 U.S. 129, 134 (2009))).

But Rivera did not argue for plain-error review on appeal.  Therefore, he has waived our review of this claim.  See United States v. Pabon, 819 F.3d 26, 33-34 (1st Cir. 2016) (failure to cite four-factor plain-error test or attempt to establish its factors constitutes waiver).

### 3. Hernández's Sentence

At Hernández's sentencing, the court applied the same three enhancements as it did for Rivera: the serious bodily injury, abduction, and carjacking enhancements. See U.S.S.G. § 2B3.1(b)(3)(B), (4)(A), (5). The court noted Hernández's age, family circumstances, and his employment, educational, health, and criminal history. Due to his criminal history category, the applicable guideline range was 151 to 188 months for the first count and a minimum of 84 months for the second count. The court sentenced Hernández to the bottom of the applicable guideline range: 151 months' imprisonment for the first count, to be served consecutively to 84 months' imprisonment for the second count, resulting in an aggregate term of 235 months' imprisonment and five years' supervised release. The court ordered that this term of imprisonment be served consecutively to a state sentence. The court considered and rejected Hernández's requests that the federal sentence run concurrently with his state sentence, or, alternatively, that his federal sentence be adjusted downward to adjust for the fact that his seven years in pre-trial federal detention would count only towards his state sentence. After the sentence was pronounced, Hernández objected to the sentence as "substantive[ly] and procedurally unreasonable."[16]

---

[16] Hernández objected below on specific grounds that he does not renew on appeal: the serious bodily injury and abduction

On appeal, Hernández challenges his sentence as procedurally unreasonable because the district court failed to adequately evaluate the 18 U.S.C. § 3553(a) factors and "upwardly varied" from the guideline range without a sufficient explanation. He concedes that the relevant guidelines range was calculated correctly. It is not clear whether Hernández also challenges the substantive reasonableness of his sentence, so "out of 'an abundance of caution, we inspect his claims . . . through both lenses.'" United States v. Calderon-Zayas, 102 F.4th 28, 35-36 (1st Cir. 2024) (quoting United States v. Ruperto-Rivera, 16 F.4th 1, 5 (1st Cir. 2021)).

We need not decide whether Hernández sufficiently advanced his procedural reasonableness challenge at sentencing because it fails under the more lenient standard of review of abuse of discretion. See United States v. Polaco-Hance, 103 F.4th 95, 100 (1st Cir. 2024). Hernández is mistaken that the court "upwardly varied" from the relevant range: the sentence that he received was in fact at the lower end of the applicable range. Both at sentencing and on appeal, Hernández failed to provide any additional information or to make any specific arguments about which § 3553(a) factors warranted a lower sentence and why. The

enhancements, his criminal history category, his state sentence running consecutively rather than concurrently to his federal sentence, and the disparity in sentence compared to other codefendants.

sentence is procedurally reasonable because the court gave a reasoned explanation for the sentence, which included a discussion of specific facts relevant to the § 3553(a) factors. This easily meets the "lightened" burden for a within-guidelines sentence, particularly since Hernández makes no specific argument as to how the court's explanation might have fallen short. See Montero-Montero, 817 F.3d at 37. Therefore, we need not decide whether Hernández waived this argument on appeal.

Similarly, the sentence is substantively reasonable because it is well within the "expansive universe of reasonable sentences." Rossignol, 780 F.3d at 477 (quoting United States v. King, 741 F.3d 305, 308 (1st Cir. 2014)). Where, as here, the sentence falls within the guideline range, "a defendant must furnish 'powerful mitigating reasons and persuade us that the district judge was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be reasonable.'" United States v. Morales-De Jesus, 896 F.3d 122, 126 (1st Cir. 2018) (quoting United States v. Navedo-Concepción, 450 F.3d 54, 59 (1st Cir. 2006)). Hernández has not furnished any such reasons; indeed, he has not given any reasons besides a conclusory argument that the § 3553(a) factors were not adequately considered. But here, too, we need not consider appellate waiver because we may affirm on the merits; the court did not abuse its discretion because it considered mitigating factors as well as

considering and rejecting defense counsel's request for an adjustment due to Hernández's state sentence.

### III. Conclusion

For the reasons above, we **<u>affirm</u>** Rivera's, Hernández's, and Ríos's convictions and Rivera's and Hernández's sentences.